No. 23-16010

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

In re TESLA, INC., SECURITIES LITIGATION

GLEN LITTLETON, Lead Plaintiff,

*Plaintiff-Appellant*

v.

ELON MUSK, TESLA, INC., BRAD W. BUSS, ROBYN
DENHOLM, IRA EHRENPREIS, ANTONIO J. GRACIAS,
JAMES MURDOCH, KIMBAL MUSK, and LINDA
JOHNSON RICE,

*Defendants-Appellees*,

Appeal from United States District Court
for the Northern District of California
Civil Case No. 3:18-cv-04865-EMC
Hon. Edward M. Chen

## PLAINTIFF-APPELLANT'S OPENING BRIEF

Nicholas I. Porritt
LEVI & KORSINSKY, LLP
1101 Vermont Avenue NW, Suite 700
Washington, DC 20005
Tel: (202) 524-4290
Fax: (212) 363-7171

Adam M. Apton
Adam C. McCall
LEVI & KORSINSKY, LLP
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Fax: (212) 363-7171

*Attorneys for Plaintiff-Appellant Glen Littleton*

## **CORPORATE DISCLOSURE STATEMENT**

Federal Rule of Appellate Procedure 26.1 requires nongovernmental corporate parties to identify parent corporations and publicly held corporations that own 10% or more of their stock. Plaintiff-Appellant Glen Littleton is an individual and, therefore, not subject to Federal Rule of Appellate Procedure 26.1.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................... IV

STATEMENT OF JURISDICTION ........................................................ 1

INTRODUCTION ................................................................................... 2

ISSUES PRESENTED ............................................................................ 4

STATEMENT OF THE CASE ................................................................ 6

    A.    BACKGROUND TO TESLA GO-PRIVATE TRANSACTION. ....................................................................................... 6

    B.    AUGUST 7, 2018 "FUNDING SECURED" AND "INVESTOR SUPPORT IS CONFIRMED".. .................................................... 8

    C.    MARKET AND PUBLIC IMMEDIATELY REACT TO MR. MUSK'S AUGUST 7, 2018 TWEETS. .................................... 10

    D.    AFTER HIS TWEETS, MR. MUSK ATTEMPTS TO SECURE FUNDING AND CONFIRM INVESTOR SUPPORT. ............................................................................. 13

    E.    NEW YORK TIMES: FUNDING IS FAR FROM SECURE. 15

    F.    MR. MUSK WITHDRAWS GO-PRIVATE PROPOSAL IN RESPONSE TO NEGATIVE VIEWS OF INVESTORS. ...... 16

    G.    PROCEDURAL HISTORY. .................................................. 18

    H.    TRIAL. .................................................................................. 21

SUMMARY OF ARGUMENT ............................................................. 26

ARGUMENT .......................................................................................... 30

    I.    JURY INSTRUCTIONS WERE ERRONEOUS WHICH REQUIRES REVERSAL. ........................................................ 30

        A.    Standard of Review ..................................................... 30

        B.    An Error in Civil Jury Instructions Requires Reversal Unless the Error is Harmless. ..................................... 30

        C.    The Jury Instructions Misstated the Law Regarding Scienter Which is Prejudicial and Requires Reversal. 30

II.    THE DISTRICT COURT COMMITTED REVERSIBLE
ERROR BY DENYING PLAINTIFF'S MOTION FOR
JUDGMENT AS A MATTER OF LAW ON MATERIALITY
AND PERMITTING THAT ISSUE TO BE DECIDED BY
THE JURY. ...................................................................... 35

    A.    Standard of Review. ...................................................... 35

    B.    Judgment as a Matter of Law Should Be Entered on a
Claim or Issue When the Evidence at Trial Permits
Only One Conclusion Based on Substantial Evidence.
............................................................................... 36

    C.    Mr. Musk's August 7, 2018 Tweets Were Material
Because There Was a Substantial Likelihood That a
Reasonable Shareholder Would Consider Them
Important. .................................................................... 37

    D.    Mr. Musk's Tweets Also Gave a Reasonable Investor
The Impression of a State of Affairs That Differs in a
Material Way From the One That Actually Exists. .... 51

CONCLUSION ........................................................................ 64

STATEMENT OF RELATED CASES ...................................... 67

CERTIFICATE OF COMPLIANCE [FORM 8] ...................... 68

CERTIFICATE OF SERVICE................................................. 70

iii

# TABLE OF AUTHORITIES

## Cases

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................. 38

*Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*,
  498 F.2d 1137 (9th Cir. 1974) ................................... 28, 36, 49

*Clem v. Lomeli*,
  566 F.3d 1177 (9th Cir. 2009) ............................................... 30

*Dang v. Cross*,
  422 F.3d 800 (9th Cir. 2005) ................................................. 30

*Erickson Prods., Inc. v. Kast*,
  921 F.3d 822 (9th Cir. 2019) ................................................. 35

*Erickson v. Pierce Cnty.*,
  960 F.2d 801 (9th Cir.1992) .................................................. 36

*Gantt v. City of Los Angeles*,
  717 F.3d 702 (9th Cir. 2013) ........................................... 30, 34

*Gebhardt v. SEC*,
  595 F.3d 1034 (9th Cir. 2010) ............................................... 26

*Janich Bros., Inc. v. Am. Distilling Co.*,
  570 F.2d 848 (9th Cir. 1977) ................................................. 37

*Lakeside-Scott v. Multnomah Cnty.*,
  556 F.3d 797 (9th Cir. 2009) ........................................... 37, 49

*Landes Constr. Co. v. Royal Bank of Can.*,
  833 F.2d 1365 (9th Cir.1987) ................................................ 36

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) ................................................. 38

*Peralta v. Dillard*,
  744 F.3d 1076 (9th Cir. 2014) ............................................... 37

iv

*SEC v. Murphy*,
  626 F.2d 633 (9th Cir. 1980) ........................................................ 29, 38

*SEC v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ............................................................ 38

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ............................................................ 28, 37, 51

*United States v. Tarallo*,
  380 F.3d 1174 (9th Cir. 2004) ............................................................ 31

*Weaving v. City of Hillsboro*,
  763 F.3d 1106 (9th Cir. 2014) ............................................ 28, 35, 36, 51

**Statutes**

15 U.S.C. § 78aa ................................................................................ 1

15 U.S.C. § 78j .................................................................................. 4

15 U.S.C. § 78u-4 ............................................................................. 33

28 U.S.C. § 1291 ............................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

28 U.S.C. § 1337 ............................................................................... 1

**Rules**

17 C.F.R. § 240-10b-5 ........................................................................ 4

Fed. R. App. P. 4 .............................................................................. 1

Fed. R. Civ. P. 50 ............................................................................ 36

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa(a), and 28 U.S.C. §§ 1331 and 1337(a).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Following a jury trial, the District Court entered a judgment in favor of Defendants dated July 11, 2023. 1-ER-2. Plaintiffs filed a Notice of Appeal on July 14, 2023. 7-ER-1477. Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), Plaintiffs' Notice of Appeal was timely.

## **INTRODUCTION**

This appeal arises from claims of a certified class of investors in securities of Tesla, Inc. for losses caused by statements by Defendant Elon Musk in August 2018 regarding a proposed transaction to take Tesla private. Specifically, on August 7, 2018, Mr. Musk tweeted to over 22 million followers: "Am considering taking Tesla private at $420. Funding secured." Later the same day, Mr. Musk tweeted: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." Each tweet was followed by immediate and statistically significant increases in Tesla's stock price. There followed a ten-day period of intense scrutiny by the media, financial analysts, and investors as well as an investigation by the United States Securities & Exchange Commission concentrating on Mr. Musk's statements: "Funding secured" and "Investor Support is confirmed." Finally, by August 17, 2018, when it had become apparent that funding for a Tesla go-private transaction was not secured and investor support was not confirmed, Tesla's stock price had plunged in value and Tesla investors had lost billions of dollars.

By order dated April 1, 2022, the District Court granted summary

2

judgment in Plaintiff's favor on the elements of falsity and scienter. 1-ER-66. Specifically, the Court held that Mr. Musk's statements were false and that "a reasonable jury could reach only one conclusion regarding scienter: that Mr. Musk made his statement recklessly." 1-ER-66 at 23-29). Following a motion for reconsideration by Defendants, the Court clarified that its summary judgment ruling meant: "the statements at issue were false and made with scienter but the Court left the issue of whether the statements were material (which also impacts reliance) for the jury to decide." 1-ER-64.

At trial, Plaintiff presented a large volume of evidence from investors, journalists, analysts, and Tesla executives emphasizing the importance of Mr. Musk's statements to investors and the market. Plaintiff also presented expert testimony opining that both statements by Mr. Musk were material to Tesla investors. Defendants offered no expert testimony. Over Plaintiff's objection, the Court still submitted the issues of materiality and reliance to the jury. The jury, based on the Court's instructions, returned a verdict in favor of Mr. Musk and the other Defendants. 1-ER-28.

## ISSUES PRESENTED

1. Did the District Court commit reversible error by misstating the applicable law with regard to the element of scienter for a claim pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240-10b-5, when, after granting summary judgment to Plaintiff on the issue whether Defendant Elon Musk acted with deliberate recklessness sufficient to satisfy the element of scienter, the Court instructed the jury in its Closing Instructions Nos. 6 and 9 that even though Elon Musk acted with with reckless disregard to whether misrepresentations were true, the jury still had to decide whether he acted knowingly to satisfy the element of scienter?

2. Did the District Court commit reversible error when it denied Plaintiff's motions under Federal Rule of Civil Procedure 50(a) and 50(b) and submitted the question of whether Elon Musk's misrepresentations were material to the jury for determination where Plaintiff presented evidence at trial, including uncontroverted expert testimony, that the misrepresentations were material and significantly altered the total mix of information

available to a reasonable investor and Defendants offered no
contrary evidence?

## STATEMENT OF THE CASE

### A. BACKGROUND TO TESLA GO-PRIVATE TRANSACTION.

As Chief Executive Officer of Tesla, Mr. Musk had long expressed his frustrations with the demands arising from operating as a public company and a desire to take Tesla private. 3-ER-574; 4-ER-768. On July 31, 2018, Mr. Musk met with representatives of the Saudi Arabia Public Investment Fund, including Yasir Al-Rumayyan. 4-ER-779. The meeting lasted approximately 45 minutes. During the meeting, Mr. Al-Rumayyan expressed support for Tesla and said he "would like to listen more about [Mr. Musk's] plan to take it private." *Id*. As Mr. Al-Rumayyan described the meeting in subsequent texts sent to Mr. Musk on August 11 and 12, 2018: "We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia . . . . Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction" and "the agreement as was minuted by my people is to wait for the information to be sent be [sic] you within a week, on how we will move forward together." 4-ER-790. At the close of the meeting, Mr. Al-Rumayyan asked Musk to share his thoughts on the structure for the

transaction, the percentage of ownership that would be needed to complete the deal, and his "financial calculations to take it private." 4-ER-779.

Importantly, critical terms were not discussed with the Saudi PIF on July 31, 2018. The fundamental term of the price to be paid for Tesla stock in a going private transaction, later proposed by Mr. Musk as $420 per share, $120 or 40% higher than its closing price on July 31, 2018, was never discussed. 4-ER-779; 3-ER-400. The percentage of any private Tesla that the Saudi PIF might own was not discussed, nor was the overall structure of the transaction. 3-ER-400-01. Although Mr. Musk did not communicate it to the Saudi PIF, he had no intention of letting the Saudi PIF obtain majority control of Tesla and wanted to limit its investment stake to 20 to 30 percent. 3-ER-438; 3-ER-450. The total amount of funding, or even a range, was also not discussed; indeed the amount of funding required was not even knowable as of July 31, 2018. 2-ER-356; 3-ER-420. No legally binding document was created as a result of the July 31, 2018 meeting with the Saudi PIF and there was no legal recourse against the Saudi PIF in the event they chose not to provide any funding. 2-ER-331.

On August 2, 2018, Mr. Musk sent a short email to Tesla's Board of Directors with the subject line reading: "Offer to Take Tesla Private at $420." 4-ER-782. Mr. Musk did not provide any additional information or terms for the transaction, such as the structure or source of funding. *Id*. There is no discussion of the price or how it was determined in the body of the email; it is solely referred to in the subject line. *Id*. Mr. Musk also wrote that the "offer expires in 30 days." *Id*. This "offer" was later described at trial by Professor Guhan Subramanian of Harvard Law School as so flimsy and lacking in thought and analysis that it was "just an illusory offer, it's not real." 2-ER-303-07.

## B. AUGUST 7, 2018 "FUNDING SECURED" AND "INVESTOR SUPPORT IS CONFIRMED"..

On August 7, 2018 at 9:48 a.m. PDT, Mr. Musk tweeted "Am considering taking Tesla private at $420. Funding secured." 4-ER-734. Mr. Musk intended the tweet to contain three essential facts regarding a Tesla go-private transaction: "I'm saying that I am considering -- very importantly, considering – not that it will happen, but that I'm thinking about it – taking Tesla private at 420. And that, in my opinion, the funding is secured for taking Tesla private at that price. The reason I said that price was that I was not confident it could be done at a higher

price." 2-ER-335. Shortly after Mr. Musk's initial tweet at 9:48 a.m. PDT, Tesla's then-Chief Financial Officer, Deepak Ahuja, texted him: "Elon, am sure you have thought about a broader communication on your rationale and structure to employees and potential investors. Would it help if Sarah [O'Brien, head of Tesla Global Communications], Todd [Maron, Tesla's General Counsel], and I draft a blog post or employee email for you?" 4-ER-793. The email was drafted and sent and then posted onto Tesla' public blog. 4-ER-735. The email did not mention funding or the Saudi PIF. *Id*. At 12:36 p.m. PDT, Mr. Musk tweeted a link to his email to Tesla employees adding the statement: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." 4-ER-737.

### C.    MARKET AND PUBLIC IMMEDIATELY REACT TO MR. MUSK'S AUGUST 7, 2018 TWEETS.

Tesla's stock price reacted immediately to both of Mr. Musk's tweets. 3-ER-490-92. The following chart shows the intraday movements of Tesla's stock price on August 7, 2018:



6-ER-1296. The unrebutted testimony from Plaintiff's expert, Dr. Michael Hartzmark, was that the stock price increase from 12:48 p.m., when Mr. Musk published his first tweet, to close of trading on August 7, 2018 was statistically significant at the 95 per cent confidence level. 3-ER-492-93. Prices of other Tesla securities also reacted almost instantaneously. 3-ER-478-485; 6-ER-1271; 6-ER-1273. Trading in Tesla

stock was so heavy that NASDAQ halted trading from 2:08 p.m. to 3:45 p.m. on August 7, 2018. 3-ER-497-98.

Analysts and investors immediately responded to Mr. Musk's tweets. For example, Itay Michaeli, an analyst at Citi Research, emailed Tesla's Director of Investor Relations, Martin Viecha, on August 7, 2018 to inquire whether there was "an actual transaction on the table (with secured financing)" or if going private was "more of a strategic announcement" to which Mr. Viecha responded that "the very first Tweet mentioned a firm offer." 4-ER-807.

Nii Owuraka Koney, a Managing Director at Jennison Associates, a significant Tesla investor, also emailed Mr. Viecha on August 7, 2018 requesting a telephone call to discuss the "funding" for the transaction. Mr. Viecha responded that "[t]he very first tweet simply mentioned 'Funding secured' which means that this is a firm offer" and that "the offer is as firm as it gets." 4-ER-777. It was important to Mr. Koney that Tesla's CEO had publicly stated that funding was secured. 6-ER-1339.

Bradley Erickson, an analyst at KeyBanc Capital Markets, also emailed Mr. Viecha on August 7, 2018 asking for him to "clarify" whether "financing is secured." Mr. Viecha responded by confirming that "the first

Tweet clearly stated that 'financing is secured.' Yes, there is a firm offer." 4-ER-812. And, Toni Sacconaghi, an analyst at AllianceBernstein, emailed Mr. Viecha on August 7, 2018 for "questions/clarifications on today's news and blog post." Mr. Viecha stated in response that "apart from what has been tweeted and what was written in a blog post, we can't add anything else. I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct" and that "financing is secured regardless of other assumptions." 4-ER-814.

JP Morgan's analyst, Ryan Brinkman, considered Mr. Musk's tweets so important that he adjusted his price target for Tesla stock as a result. 6-ER-1347-51. He wrote on August 8, 2018:

> As surprising to us as these developments are, and as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured. Therefore, we are incorporating into our valuation the real possibility the equity will be taken out at $420 per share.

4-ER-738.

Finally, Mr. Musk's tweets also prompted an immediate regulatory

response from the SEC as it also made enquiries of Tesla about the tweets. On the afternoon of August 7, 2018, Mr. Ahuja, emailed Mr. Musk alerting him that "We are getting a lot of enquiries from investors, SEC and the media to better understand the comment 'Funding secured.'" 2-ER-342-43; 5-ER-1052.

### D. AFTER HIS TWEETS, MR. MUSK ATTEMPTS TO SECURE FUNDING AND CONFIRM INVESTOR SUPPORT.

On August 10, 2018, Mr. Musk met for the first time with his financial advisors: Egon Durban of Silver Lake Partners and Dan Dees of Goldman Sachs. 3-ER-450; 5-ER-906; 5-ER-1027. After hearing Mr. Musk discuss his meeting with the Saudi PIF, both Mr. Durban and Mr. Dees understood that there was no committed funding for any Tesla go-private transaction. 3-ER-435; 3-ER-453-454; 3-ER-456-457; 5-ER-906; 5-ER-1027. According to Mr. Durban, the potential Tesla go-private was not even at Stage 1 of his "Illustrative Public-to-Private Process Timeline". 3-ER-435-436. Stage 1 was titled "Submit formal proposal to board following arrangement of committed financing." 5-ER-906 at 29. Silver Lake and Goldman Sachs then spent the next two weeks starting to raise funding and gauge investor support. 3-ER-436; 3-ER-432; 5-ER-

13

954.

On August 13, 2018, Mr. Musk posted an "Update on Taking Tesla Private" on Tesla's website. 4-ER-775. In this update, Mr. Musk stated that the Saudi PIF "has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements." *Id*. Mr. Musk then stated "I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base." *Id*. In response to the blog post, Mr. Al-Rumayyan texted Mr. Musk: "Elon, I am personally surprised. You have signed an NDA while we are waiting for you and your team to provide us with information to move forward, you post an ill-advised blog with loose information." 4-ER-790 at 13.

In the August 13, 2018 update, Mr. Musk also stated that: "my best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla." 4-ER-775.

14

Neither Mr. Musk nor his financial advisors, however, had yet meaningfully engaged with any potential investor in a private Tesla. On August 16, 2018, Silver Lake and Goldman Sachs, on Mr. Musk's behalf, was in the process of obtaining "formal permission to make the following calls to respond / engage potential interested / existing investors: Saudi Arabia, UAE, ten cent [sic], google [sic], Ron Barron, Silver Lake affiliates." 5-ER-954. The email then said "No solicitation will be made other than testing their interest to participate in the Tesla going private initiative led by Elon." *Id.*

### E. *NEW YORK TIMES*: FUNDING IS FAR FROM SECURE.

On the evening of August 16, 2018, the *New York Times* published an article based on a lengthy interview with Mr. Musk. 4-ER-824. The article described the events of August 7, 2018, including his tweets as well as facts such as the tweets were not approved in advance by Tesla's Board and that "funding, it turned out, was far from secure" because the Saudi PIF "had not committed to provide any cash." 4-ER-824 at 2. The price of Tesla's stock and other securities reacted immediately with the stock price declining to $305.50, a decline Dr. Hartzmark testified was statistically significant. 3-ER-530-532; 6-ER-1080 at 22.

15

This *New York Times* article led Mr. Brinkman of JP Morgan to discount entirely the possibility of a going private transaction for Tesla and conclude that the August 7, 2018 tweets were not true. 6-ER-1080 59-69. Accordingly, Mr. Brinkman revised his price target for Tesla stock back to what it had been before Mr. Musk's tweets on August 7, 2018. *Id*. On August 20, 2018, Mr. Brinkman published another note stating: "our interpretation of subsequent events leads us to believe that funding was not secured for the going-private transaction, nor was there any formal proposal." 4-ER-753. This interpretation "is different from our understanding on August 8th which was based on Mr. Musk's statement on Twitter." *Id*.

### F. MR. MUSK WITHDRAWS GO-PRIVATE PROPOSAL IN RESPONSE TO NEGATIVE VIEWS OF INVESTORS.

On August 23, 2018, the Tesla Board held an in-person meeting. 4-ER-753. Silver Lake Partners and Goldman Sachs attended. *Id*. Although Mr. Durban and Mr. Dees advised the Tesla Board that they believed raising the necessary financing was "doable", their discussion materials demonstrate that neither the price per share nor the amount of capital required for a go-private transaction had been determined; each was indicated by "[*]". 5-ER-955 at 9, 58. While taking Tesla private would

16

require "$[*]B of committed capital", neither Mr. Musk nor his financial advisors had even $1 of committed capital. 3-ER-435. Instead, at the meeting, Silver Lake Partners and Goldman Sachs outlined a process which could identify and seek the necessary funding for the going private transaction. 4-ER-785 at 2-3.

Mr. Musk also discussed with the Board "information he had learned in recent weeks following his announcement, including but not limited to, the negative views of many of Tesla's current stockholders regarding the prospect of Tesla going private, the difficulties the Company's current stockholders would have in continuing to own Tesla's stock if the Company went private . . . ." 2-ER-346-347; 4-ER-785 at 1. Mr. Musk then informed the Tesla Board "that he was withdrawing his offer to try and take [Tesla] private." 4-ER-785 at 4. In a press release the next day, Mr. Musk and Tesla announced that Tesla was staying a public company. 5-ER-1025. Mr. Musk noted that "given the feedback I've received, it's apparent the most of Tesla's existing shareholders believe we are better off as a public company…. the sentiment, in a nutshell, was 'please don't do this.'" *Id.*

## G.   PROCEDURAL HISTORY.

### i.   The District Court Denies Defendants' Motion to Dismiss.

By order dated April 15, 2020, the District Court denied Defendants' motion to dismiss Plaintiff's consolidated complaint. 2-ER-193. In pertinent part, the District Court found that Plaintiff stated a claim based on the August 7, 2018 tweet: "Am considering taking Tesla private at $420. Funding secured." The District Court held: "The statement could be read by a reasonable investor to mean complete funding for the transaction was unconditionally secured. So read, the statement is false." 2-ER-193 at 22. Responding to Defendants' argument that "funding secured" meant only that funding would be "no obstacle" and the entire tweet was simply a statement of opinion about implicitly conditional funding, the District Court observed that "the word 'secured' implicitly negates any condition", 2-ER-193 at 23, and then noted:

> Because Mr. Musk, the CEO of Tesla, included the highly-specific price of $420 at which shares would be bought for the going-private transaction, and because his tweet followed with "funding secured," a reasonable investor would have interpreted it as something more than a speculative amorphous opinion about future possibilities. Instead, it can be read as implying a more concrete state of affair.

2-ER-193 at 24. The District Court also denied Defendants motion to

18

dismiss Plaintiff's claim based on the tweet "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." 2-ER-193 at 24-25. The District Court also found that Plaintiff adequately pleaded the other elements of a Rule 10b-5 claim. 2-ER-193 at 29-40.

### ii. The District Court Awards Partial Summary Judgment to Plaintiff.

On April 1, 2022, the District Court entered an order granting partial summary judgment in favor of Plaintiff. 1-ER-66. With regard to Mr. Musk's statement "Am considering taking Tesla private at $420. Funding secured", the District Court found that "no reasonable jury could find the statement 'Funding secured' accurate and not misleading." 1-ER-66 at 24. The District Court then elaborated:

> As indicated above, the Court acknowledges that there is some softness to the term "secured.' But even accepting that there is some room for disagreement as to precisely how secure something must be before the term may be appropriately used, the term is not so elastic as to escape any real meaning. No reasonable jury could find "Funding secured" accurate and not misleading even under a liberal understanding of the term "secured."

1-ER-66 at 25. With regard to scienter the District Court found: "a

reasonable jury could reach only one conclusion − *i. e.*, that Mr. Musk recklessly tweeted to the public that funding was secured." 1-ER-66 at 26.

The District Court reached a similar conclusion regarding Mr. Musk's statement that "Investor support is confirmed." 1-ER-66 at 26-27. "No reasonable [jury] could conclude that support from the Saudi PIF was confirmed given the preliminary nature of the discussions between the PIF and Tesla." 1-ER-66 at 27. The District Court also noted that Mr. Musk did not reach out to existing Tesla shareholders to get their views on taking the company private until after the tweet had been sent. 1-ER-66 at 26-27. Finally, the District Court found only one possible conclusion regarding scienter: Mr. Musk made his statement recklessly. 1-ER-66 at 27.

The District Court also found that no reasonable jury could find the statement "Only reason why this is not certain is that it's contingent on a shareholder vote" accurate and not misleading. 1-ER-66 at 29. This was because "there were, in fact, a number of contingencies that had to be addressed before the matter could reach a shareholder vote". *Id*. The District Court found that "the scienter analysis follows the falsity

20

analysis. No reasonable jury could find that Mr. Musk did not act recklessly given his clear knowledge of the discussions that took place at the 7/31/2018 meeting." *Id.*

Following a motion for reconsideration by Defendants, the Court clarified that its summary judgment ruling meant: "the statements at issue were false and made with scienter but the Court left the issue of whether the statements were material (which also impacts reliance) for the jury to decide." 1-ER-64.

## H.   TRIAL.

Subject to the District Court's rulings on summary judgment, this action went to a jury trial held from January 17, 2023 to February 3, 2023. The jury heard eight days of witness testimony, including from Mr. Musk who testified about the circumstances and his state of mind surrounding the August 7, 2018 tweets. During trial, the District Court instructed the jury that "testimony regarding the circumstances and communications relating to the two tweets by Elon Musk on August 7th, 2018 and Mr. Musk's state of mind as to those tweets … may be relevant to other issues on which the plaintiff has the burden of proof, such as whether Mr. Musk knew the statements were untrue when he made

them…." 2-ER-285-286.

Plaintiff also presented testimony from two experts regarding the materiality of Mr. Musk's August 7, 2018 tweets: Professor Steven Heston of the University of Maryland and Dr. Hartzmark. Professor Heston opined, in pertinent part, that shortly after Mr. Musk's initial "funding secured" tweet at 12:48 p.m. on August 7, 2018, "there was a very abrupt movement in [Tesla] option prices … this movement was unprecedented." 3-ER-476; 3-ER-480-481. The movement in Tesla stock option prices was consistent with behavior in stock option prices following the announcement of a merger or acquisition. 3-ER-478-479; 3-ER-484-485.

Dr. Hartzmark testified based on his extensive qualitative analysis of over 2400 news and analyst articles about Tesla from August 7, 2018 to August 17, 2018 and quantitative analysis, including an event study, of the minute-by-minute trading data for Tesla stock. 3-ER-488-489. Dr. Hartzmark opined that the August 7, 2018 tweets had a material impact on Tesla's stock price and the price of other securities from August 7, 2018 to August 17, 2018 and, with regard to Mr. Musk's first August 7, 2018 tweet, the price was impacted by the phrase "funding secured"

rather than the first sentence in the tweet. 3-ER-496-503. Specifically, Dr. Hartzmark testified that "there is substantial qualitative evidence which would suggest that the 'funding secured' is material to the market". 3-ER-514. This testimony was unrebutted by Defendants, who presented no expert testimony.

The jury was then instructed. On the issue of scienter, the District Court provided similar instructions at two instances. When instructing on the elements of a Rule 10b-5 claim, the District Court instructed the jury:

> 2)    Elon Musk and/or Tesla acted with the necessary state of mind (*i.e.*, knowingly or with reckless disregard for the truth or falsity of the statements);
> …
> You are to assume that the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote." were untrue. But you still must decide whether these statements were of material facts.
>
> You must also assume Mr. Musk acted with reckless disregard for whether the statements were true. But you must still decide whether he knew that the statements weren't true.[1]

---

[1] Plaintiff objected to this portion of the District Court's instruction

1-ER-38 at 7-8; 3-ER-587-588. On scienter, the District Court instructed:

> Plaintiff must prove by a preponderance of the evidence that Elon Musk and/or Tesla acted with the necessary state of mind, which is known as scienter.
>
> Scienter may be established by showing either:
>
> 1.     The defendant knew his untrue statement was false; or
>
> 2.     The defendant had reckless disregard for whether the statement was true.
>
> "Reckless" means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it.

and proposed the following:

> Before this trial began, the Court decided that the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote." were untrue. The Court also decided that Mr. Musk acted recklessly when making these statements. You should treat these elements as having been proven by a preponderance of the evidence. Therefore, your deliberation is limited to whether these untrue statements were material.

7-ER-1462 at 7.

> You are to assume that Elon Musk made the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote." with at least reckless disregard for whether the statements were true. But you must still decide whether Mr. Musk acted knowingly.[2]

1-ER-38 at 11; 3-ER-590.

In closing argument, Mr. Musk's counsel argued extensively that the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote." were not material and that Mr. Musk did not act knowingly or intentionally when he published those tweets on August 7, 2018. 4-ER-

---

[2] Plaintiff objected to this portion of the District Court's instruction and proposed the following:

> Before this trial began, the Court decided that Mr. Musk acted at least recklessly when making the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote." You should therefore treat the element of scienter as having been proven by a preponderance of the evidence when deciding whether Plaintiff has proved his Rule 10b-5 Claim against Mr. Musk.

1-ER-28 at 10.

658-659; 4-ER-667; 4-ER-670; 4-ER-672; 4-ER-677; 4-ER-679-680; 4-ER-686; 4-ER-689; 4-ER-692; 4-ER-695; 4-ER-699; 4-ER-711-712; 4-ER-717-718.

After deliberating, the jury returned a general verdict in favor of Defendants. 1-ER-28. By order dated June 14, 2023, the District Court denied Plaintiff's renewed motion for judgment as a matter of law on the issue of materiality as well as a request for a new trial. 1-ER-3. Judgment was entered on July 11, 2023 and this appeal was filed July 14, 2023. 1-ER-2; 7-ER-1477.

## SUMMARY OF ARGUMENT

The District Court made two errors that require reversal of its judgment in favor of Defendants. First, the District Court erred in its jury instructions on the element of scienter. It is well-established that the element of scienter for a claim under Rule 10b-5 may be met by showing either that defendants acted knowingly or "were reckless as to the truth or falsity of their statements." *Gebhardt v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). By instructing the jury that, despite assuming that Mr. Musk acted with "reckless disregard" for whether his August 7, 2018 tweets were true, it still needed to "decide whether he knew that the statements

were untrue" or "acted knowingly", the District Court misstated the legal standard for scienter, a crucial element of Plaintiff's claim.

The jury instruction appears to require Plaintiff to prove not just that Mr. Musk acted recklessly when he published the August 7, 2018 tweets, something on which Plaintiff had already obtained summary judgment, but also prove knowledge. This is contrary to the well-established law that scienter may be established by proving *either* recklessness *or* knowledge. At a minimum, the jury instruction created sufficient confusion as to the appropriate scienter standard that it was impossible for a reasonable juror to understand it correctly.

A jury instruction that misstates the law requires reversal and a new trial unless the error is harmless. An erroneous jury instruction on a necessary element of Plaintiff's claim, especially one that seems to increase Plaintiff's burden beyond what the law requires, is plainly prejudicial and not harmless. Accordingly, reversal and a new trial is required.

The second error by the District Court was the denial of Plaintiff's motion for judgment as a matter of law on the issue of materiality. A district court should enter judgment as a matter of law "when it is clear

that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014)  A motion for judgment as a matter of law should be denied only where there is "substantial evidence" to support a verdict in favor of the non-movant. *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974)

On the issue of materiality, Plaintiff presented extensive evidence supporting the materiality of both August 7, 2018 tweets. A statement is material if there is a substantial likelihood that it would have been viewed by a reasonable investor as having "significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) Here, Plaintiff presented quantitative, statistical evidence of an immediate, statistically significant, impact of both tweets on the prices of Tesla's securities as well as qualitative evidence of the importance of the tweets from investors, analysts, internal Tesla communications, NASDAQ, and the SEC. The vast majority of the evidence was unrebutted by Defendants. They did not present an expert to offer an alternative analysis of the market data and no witness testified that either tweet was immaterial.

This Court has observed that the materiality of statements regarding certain fundamental corporate subjects "is not subject to serious challenge." *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980). Similarly, the materiality of statements regarding the funding and investor support for a potentially $60 billion transaction should also not be subject to serious challenge. In any event, the substantial evidence introduced by Plaintiff at trial permits only one conclusion: that Mr. Musk's August 7, 2018 tweets were material. Accordingly, judgment as a matter of law should have been entered in favor of Plaintiff on this issue and not submitted to the jury.

Based on the instructions given by the District Court, the jury was required to return a verdict in Defendants' favor if it determined that either Mr. Musk did not act knowingly (which is contrary to the law) or that the August 7, 2018 tweets were not material (which is contrary to the evidence). Thus, neither of these errors qualify as harmless. This Court should reverse and remand for a new trial.

## ARGUMENT

## I.   JURY INSTRUCTIONS WERE ERRONEOUS WHICH REQUIRES REVERSAL.

### A.   Standard of Review

A district court's formulation of the jury instructions is reviewed for abuse of discretion. Jury instructions that are claimed to misstate the law are reviewed *de novo*. *Gantt v. City of Los Angeles*, 717 F.3d 702, 706 (9th Cir. 2013). Plaintiff argues that the jury instructions given in this case misstated the law.

### B.   An Error in Civil Jury Instructions Requires Reversal Unless the Error is Harmless.

Jury instructions must correctly state the law and must not be misleading. *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005). "An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009). The burden shifts to the defendant to demonstrate that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Id.*

### C.   The Jury Instructions Misstated the Law Regarding Scienter Which is Prejudicial and Requires Reversal.

It is well-established that the element of scienter for a claim under

30

Rule 10b-5 may be met by showing that defendants acted knowingly or "were reckless as to the truth or falsity of their statements." *Gebhard*, 595 F.3d at 1041; *see also United States v. Tarallo*, 380 F.3d 1174, 1188-89 (9th Cir. 2004). This is reflected in the Ninth Circuit Model Civil Jury Instructions 18.5. The District Court here, however, instructed the jury during trial and in closing instructions that Plaintiff had the burden to prove that Mr. Musk acted knowingly when he published his tweets on August 7, 2018. This misstates the law.

On the third day of trial, the District Court reacted to testimony that had been received the prior day and gave a cautionary instruction. It instructed the jury that "testimony regarding the circumstances and communications relating to the two tweets by Elon Musk on August 7th, 2018 and Mr. Musk's state of mind as to those tweets … may be relevant to other issues on which the plaintiff has the burden of proof, such as whether Mr. Musk knew the statements were untrue when he made them…."

Following the close of evidence, and over Plaintiff's objection, the District Court again instructed the jury and twice addressed the issue of scienter. The first time, it stated: "You must also assume Mr. Musk acted

with reckless disregard for whether the statements were true. But you must still decide whether he knew that the statements weren't true." The second time it stated:

> You are to assume that Elon Musk made the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote." with at least reckless disregard for whether the statements were true. But you must still decide whether Mr. Musk acted knowingly.

All three of these instructions misstate the law. As the District Court had granted summary judgment for Plaintiff and against Mr. Musk on the element of scienter, Plaintiff had no burden at trial to prove anything regarding Mr. Musk's state of mind. The District Court had determined that no reasonable juror could find that Mr. Musk did not act with sufficient recklessness to establish scienter when he published his August 7, 2018 tweets. Plaintiff, therefore, had no burden to prove that Mr. Musk acted knowingly. Even if Plaintiff had not won summary judgment on this element, he would still have had the option to establish scienter through proof of recklessness as opposed to knowledge. The District Court's instructions thus placed an improperly high burden on

Plaintiff beyond that required by the law.[3]

Each closing instruction was preceded by a statement that scienter could be established by showing that Elon Musk acted either knowingly or with reckless disregard for the truth or falsity of his statement and that the jury was to assume he acted recklessly. This, however, does not overcome the problematic instructions which instruct very clearly that the jury "must still decide whether Mr. Musk acted knowingly". At best, it creates a confusing instruction which is impossible for a reasonable juror to understand. The jury was instructed that scienter could be established by either recklessness or knowledge, to assume recklessness, but then instructed to consider knowledge. To the extent this finding on knowledge was to be considered on the question of apportionment, this instruction should have been given with the remaining instructions on apportionment, not included with the scienter instructions.

Any juror confusion on this element of Plaintiff's claims was exacerbated by Defendants' counsel arguing the issue of Mr. Musk's lack

---

[3] The issue of knowledge is relevant on the issue of apportionment under § 21D(f) of the Securities Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff does not bear the burden of proving knowledge for purpose of apportionment however.

33

of intent or knowledge as exculpatory in his closing arguments. For instance, counsel argued "in that moment, Mr. Musk did not form some intention to deceive. [Plaintiffs] know, in that rushed state, it led to imperfect word choices." 4-ER-667; *see also* 4-ER-670 (referring to Mr. Musk's "fog of war"); 4-ER-672 (Mr. Musk "doesn't think ahead of time in that rushed moment"). The misleading and confusing instruction on scienter is so fundamental that it cannot be deemed harmless, especially as the jury returned a general verdict form with no indication what element they determined Plaintiff had failed to meet his burden.

In *Gantt*, this Court reversed a jury verdict after a confusing and misleading jury instruction on the state of mind requirement for culpable due process violations by a police officer. 717 F.3d at 708. Because the instructions misstated the state of mind requirement so that the jury was confused and misled over the proper standard, the instructions were erroneous. *Id*. As plaintiff's claims had sufficient evidentiary support to be presented to the jury and survive a motion for judgment as a matter of law, the error could not be deemed harmless. *Id*. at 709. The action was reversed and remanded for a new trial. *Id*.

Similarly, in *Erickson Products., Inc. v. Kast*, this Court reversed a

34

jury verdict following an erroneous instruction confusing the mental states of willfulness and negligence. *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 834–35 (9th Cir. 2019). The erroneous willfulness instruction was likely prejudicial to Kast. "While the evidence may have established that Kast was negligent, it is much less clear that it established recklessness, willful blindness, or actual knowledge…. If the jury had been properly instructed, it might well have refused to find Kast willful on this record. *Id.*

Accordingly, error by the District Court in instructing the jury on the element of scienter in this case was likely prejudicial to Plaintiff and cannot be deemed harmless. Accordingly, the judgment must be reversed and remanded for a new trial.

## II. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY DENYING PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON MATERIALITY AND PERMITTING THAT ISSUE TO BE DECIDED BY THE JURY.

### A. Standard of Review.

Denial of a motion for judgment as a matter of law at trial is reviewed *de novo. Weaving*, 763 F.3d at 1111.

**B.**     **Judgment as a Matter of Law Should Be Entered on a Claim or Issue When the Evidence at Trial Permits Only One Conclusion Based on Substantial Evidence.**

The Court should enter judgment as a matter of law "when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." *Weaving*, 763 F.3d at 1111 (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 50(a)-(b). The "standard is whether or not, viewing the evidence as a whole, there is *substantial* evidence present that could support a finding, by reasonable jurors, for the nonmoving party." *Chisholm*, 498 F.2d at 1140 (emphasis added).

"Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Landes Constr. Co. v. Royal Bank of Can.,* 833 F.2d 1365, 1371 (9th Cir.1987). "It is error to deny a judgment [as a matter of law] when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." *Erickson v. Pierce Cnty.,* 960 F.2d 801, 804 (9th Cir.1992). Thus, the Court should enter judgment as a matter of law when the evidence presented at trial permits "only one reasonable

36

conclusion," *Peralta v. Dillard*, 744 F.3d 1076, 1085 (9th Cir. 2014), and "the conclusion is contrary to that reached by the jury." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (internal quotation marks and citation omitted).

Judgment as a matter of law is also "appropriate when the jury could have relied only on ***speculation*** to reach its verdict." *Id.* at 803 (emphasis added). The existence of a "mere scintilla" of evidence "is not enough to sustain a verdict." *Lakeside-Scott*, 556 F.3d at 802; *Janich Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 853 n.2 (9th Cir. 1977).

### C. Mr. Musk's August 7, 2018 Tweets Were Material Because There Was a Substantial Likelihood That a Reasonable Shareholder Would Consider Them Important.

Information is "material" when there is a "substantial likelihood that a reasonable shareholder would consider it important." *TSC Industries*, 426 U.S. at 449 ("Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." This is an objective test, assessing the significance of a piece of information to a "reasonable investor." *Id.* at 445; *accord Amgen Inc. v. Connecticut Ret. Plans & Tr.*

37

*Funds*, 568 U.S. 455, 467 (2013) (noting materiality is an objective test). Materiality is assessed "at the time of the [statement]." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 892 (9th Cir. 2008).

This Court has observed that "surely, the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge." *Murphy*, 626 F.2d at 653; *see also SEC v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011)("Information regarding a company's financial condition is material to investment."). Similarly, the materiality of statements regarding the funding and investor support for a potentially $60 billion transaction should also not be subject to serious challenge. In any event, the substantial evidence introduced at trial permits only one conclusion: that Mr. Musk's August 7, 2018 tweets were material.

### i.  "Funding secured" Was Important to Reasonable Investors.

The evidence that the statement "funding secured" was material came from multiple sources, including Mr. Musk himself, other Tesla witnesses, investors and analysts, and finally from expert testimony.

Mr. Musk intended Tesla investors to rely on his "funding secured" tweet and expected a stock price increase. Mr. Musk testified that he

38

intended his August 7, 2018 tweets to reach his "millions of followers," that his tweets affected the price of Tesla's stock, and that information about Tesla in his tweets was "information that [Mr. Musk] think[s] the public should hear." 2-ER-318-322. Further, Mr. Musk admitted that "funding secured" was one of the three central pieces of information he sought to disclose to the market on August 7, 2018 and intentionally did so for the purpose of "communicat[ing] this to all investors of Tesla" and "wanted them to rely on this tweet . . . in making their decisions about buying or selling Tesla securities." 2-ER-335-336.

Mr. Musk even admitted that he expected "there would be some increase" in the price of Tesla's stock in response to his tweet. 2-ER-337. Moreover, Mr. Musk acknowledged that news of his funding to take Tesla private was "material non-public information." 2-ER-329. He also acknowledged that this information should not have been disclosed during market hours because "you would not disclose important information during a trading day." 2-ER-334. Indeed, the disruption caused by the "funding secured" tweets led to NASDAQ halting trading in Tesla shares on the afternoon of August 7. 2-ER-339. Mr. Ahuja also acknowledged that Mr. Musk's initial August 7, 2018 tweet was material

information. 3-ER-404-405.

Investors testified that the statement "funding secured" was important to them. Plaintiff Glen Littleton testified that "funding secured" was the "primary driver," the "only thing that mattered," and the "most important" part of the August 7, 2018 tweet. 2-ER-269; 2-ER-274; 2-ER-275; 2-ER-279; 2-ER-281. In response to the tweet, Mr. Littleton began selling the securities he owned because he realized the impact of the tweet "was going to pretty much wipe me out." 2-ER-269-271.

Tim Fries testified similarly to Mr. Littleton that he relied on the "funding secured" tweet when deciding to invest in Tesla. Mr. Fries testified that he had been looking for a "good entry point" into Tesla for some time when, on August 7, 2018, he saw the tweet on CNBC and decided to invest. 2-ER-287-289. "The phrase 'funding secured' in that tweet was critical. Funding secured gave me the confidence that I could get in and – at that 420 price. . . . ." 2-ER-289.

Owuraka Koney from Jennison Associates, which was a significant investor in Tesla in 2018, also placed importance on the statement "funding secured". After reading Mr. Musk's email to Tesla employees

published later on August 7, 2018, Mr. Koney wrote to Mr. Viecha at Tesla: "Nothing on funding, though?" Mr. Viecha responded: "The very first tweet simply mentioned 'Funding secured' which means that that is a firm offer. . . . I would assume that given we went full-on public with this, the offer is as firm as it gets." 2-ER-385; 2-ER-387; 4-ER-777. Mr. Koney testified that it was important to him that the CEO of Tesla had said that funding was secured publicly. 6-ER-1310 at 30. Mr. Viecha fielded enquires from "many investors" about Mr. Musk's statement "funding secured". 2-ER-394; 4-ER-805; 4-ER-807; 4-ER-810; 4-ER-812; 4-ER-814; 4-ER-817.

Financial analysts attached significance to the statement "funding secured". Inquiries also came from well-known analysts following Tesla. Itay Michaeli from Citi asked, "The employee letter didn't make clear whether there is an actual transaction on the table (with secured financing) or if this is more of a strategic announcement to consider pursuing such transaction." 2-ER-379; 4-ER-807. In response to Mr. Michaeli's question, Mr. Viecha writes: "The very first tweet mentioned a firm offer." 2-ER-380.

Mr. Viecha made a similar response to Bradley Erickson from

KeyBank. Mr. Erickson wrote: "He said financing is secured but in the letter he doesn't address this. Can you clarify?" Mr. Viecha responded: "I can only say that the first tweet clearly stated that 'financing is secured.' Yes, there is a firm offer." 2-ER-383-384; 4-ER-812. Mr. Viecha also received questions from Toni Sacconaghi from Bernstein Alliance. Mr. Sacconaghi asked: "What does 'Financing secured' actually mean? Are you assuming Tesla will need 60 billion plus in financing, or assuming that many shareholders don't take the offer and Tesla needs less? Big difference. 'Financing secured' implies the former." Mr. Viecha responded unequivocally, "It means that financing is secured regardless of other assumptions." 2-ER-389-391; 4-ER-814.

Analysts did more than just ask Mr. Viecha questions. In response to Mr. Musk's August 7, 2018 tweets, Mr. Brinkman, the J.P. Morgan analyst, increased his price target "very materially" from $195 to $308. 6-ER-1084 at 38-42; 4-ER-738. In his note announcing the increase, Mr. Brinkman provided reasons for increasing his price target and stated "Either funding is secured or it is not secured, and Tesla CEO says funding is secured." 4-ER-738.

Regulators regarded the "funding secured" tweet as important. NASDAQ regarded the statement "funding secured" and the market reaction that followed to be sufficiently important that it halted trading in Tesla stock from 2:08 p.m. to 3:45 p.m. on August 7, 2018. 3-ER-497-498. By the afternoon of August 7, 2018, Tesla had already received an enquiry from the SEC. Mr. Ahuja emailed Mr. Musk stating: "We are getting a lot of enquiries from investors, SEC and the media to better understand the comment 'Funding secured.'" 2-ER-342-343; 5-ER-1052.

Unrebutted expert testimony that the tweet was material. Dr. Hartzmark provided qualitative and quantitative analysis of the market's reaction to the "funding secured" tweet. Following the tweet, he observed an "immediate[] . . . spike in volume" and "spike in the price." 3-ER-491. He testified that he performed a statistical study referred to as a "regression" analysis and confirmed with 95% confidence that Tesla's stock price moved in response to the tweet (and not from unrelated market factors). 3-ER-498-499. The materiality of the tweets also impacted stock options and convertible notes. 3-ER-501. Professor Heston also opined that shortly after Mr. Musk's initial "funding secured" tweet at 12:48 p.m. on August 7, 2018, "there was a very abrupt

43

movement in [Tesla] option prices … this movement was unprecedented." 3-ER-476; 3-ER-480-481.

Qualitatively, the evidence also established without a doubt that the tweets were material. Dr. Hartzmark relied on news reports, including CNBC, as well as internal emails and analyst reports and emails. 3-ER-502-506. These materials each focused on the import of "funding secured" and demonstrated how the market responded to those two words. CNBC highlighted the announcement within a couple of hours while other analysts attempted to elicit further information from Tesla as to what Musk meant (*i.e.*, whether an offer had been received or a written commitment had been given). As Mr. Brinkman said, "As surprising to us as these developments are, and as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured." 4-ER-738. As explained by Dr. Hartzmark, J.P. Morgan's report was especially meaningful because it materially increased the bank's "price target" for

Tesla stock, which required approval at senior levels. 3-ER-508-510. For Dr. Hartzmark "materiality from an economic perspective" is when "a mix of information change that would motivate buyers and sellers to take action." The 'funding secured' tweet is "material information because investors [were] interested in it." 3-ER-506.

Dr. Hartzmark clearly confirmed that "[b]ased on all the information I've shown you from analysts, internal documents, price factors, volume factors, implied volatility, the convertible bonds all suggest that the tweets are material" and that "there is substantial qualitative evidence which would suggest that the 'funding secured' is material to the market." 3-ER-513-514. Notably, the qualitative evidence considered by Dr. Hartzmark included evidence that Mr. Musk's interest in taking Tesla private was already publicly known by August 2018 and that any go-private transaction would involve a premium on Tesla's then-market price. 3-ER-556-558; 3-ER-573-575; 4-ER-768. This qualitative analysis enabled Dr. Hartzmark to identify "funding secured" as the material information in Mr. Musk's first August 7, 2018 tweet. 3-ER-535-536.

No witness testified that "funding secured" was immaterial. No witness testified that the statement "funding secured", either taken in isolation or read in the context of the entire tweet, was immaterial or unimportant to Tesla investors. Defendants presented no expert witness.

### ii. "Investor support is confirmed" Was Important to Reasonable Investors.

Similarly to "funding secured", multiple witnesses provided evidence that "investor support is confirmed" was important to Tesla investors without any contradictory evidence.

Like his initial tweet on August 7, 2018, Mr. Musk intended his last tweet "Investor support is confirmed . . . ." to be read by investors. 2-ER-357. As with "funding secured", Mr. Viecha also received numerous questions about the "Investor support is confirmed…" tweet. 3-ER-423 (Viecha Test. at p.1278).

Joseph Fath, a Vice President at T. Rowe Price whose fund had a significant investment in Tesla in August 2018, confirmed that "investor support is confirmed" was important to him in understanding the status of the proposed go-private transaction. In response to a question as to what it meant, Mr. Fath responded: "Well, with the funding secured Tweet followed by this, that he had it lined up, whatever investors that

may be, to support the transaction and be able to take them private. That was my, you know - - and again, I think it just reinforced the funding secured." 6-ER-1167 at 32-33. Similarly, Mr. Brinkman testified that the "investor support" tweet was an "important source" for his note as it was "completing in my mind the questions that I had" following the "funding secured" tweet. 6-ER-1084 at 30-33.

Dr. Hartzmark also confirmed that "Investor support is confirmed . . ." was material to reasonable Tesla investors. Dr. Hartzmark testified that the "qualitative information . . . suggests it's information that is important to the mix of information investors act[ed] on." 3-ER-514. When asked further, Dr. Hartzmark testified that "I've gone through and looked at these dates, looked at the movements in implied volatility and prices, it would suggest that, you know, that 'investor support confirmed' and 'funding secured' are very important pieces of information. And, again, the reason is that we see that the investors were interested in it. That's the quintessential definition for economic materiality." 3-ER-536. Dr. Hartzmark explicitly identified a substantial spike in response to the "Investor support is confirmed . . ." tweet once trading resumed on NASDAQ after the trading halt. 3-ER-536. Nine

minutes after the "Investor support is confirmed…" tweet, "at 3:45 p.m. when trading resumes, again, as you would expect in an efficient market, the price immediately spikes up." *Id.*

As with "funding secured", there was no testimony from any witness that the statement "Investor support is confirmed…" was immaterial or unimportant to Tesla investors. There was no expert testimony on behalf of Defendants.

In sum, Plaintiff presented substantial fact and expert evidence that the statements "funding secured" and "investor support is confirmed" were important to reasonable Tesla investors and, therefore, material under *TSC*. Defendants presented no evidence to the contrary.

Accordingly, the District Court should have granted Plaintiff's motions for judgment as a matter of law on this question of materiality. In denying the motion, The District Court relied on the fact that Tesla's stock price rose slightly after the August 13, 2018 blogpost. 1-ER-3 at 14. According to the District Court, this "arguably creates the inference that the stock price reaction to the tweets on August 7 stemmed from the market reaction to Mr. Musk contemplating [taking] Tesla private at $420 per share and not to statements that funding was secured or

investor support was confirmed." *Id*. Later in its order, the District Court identifies this as "Defendants' argument" without any record citation. *Id*. at 15. This "arguable inference" or "Defendants' argument" does not amount to the "substantial evidence" required to deny a motion for judgment as a matter of law. *Chisholm*, 498 F.2d at 1140. Indeed, it is precisely the "mere scintilla" of evidence and "speculation" that is insufficient to deny such a motion. *Lakeside-Scott*, 556 F.3d at 802-03.

Furthermore, this "arguable inference" is properly described as "argument" as it is not supported by the evidence as introduced at trial. The qualitative analysis undertaken by Dr. Hartzmark shows that investors were interested in "funding secured" and "investor support" as demonstrated by Mr. Brinkman's analyst report, the email enquiries received by Mr. Viecha, and the SEC enquiry received by Mr. Ahuja. There was no testimony explaining how such direct evidence of materiality should be discarded based on a statistically insignificant price movement on a single day six days after the statements were made. It also ignores evidence that even after the August 13, 2018 blogpost, analysts still regarded the confirmation of investor support given by Elon Musk on August 7, 2018 as important, material information. 3-ER-526-

49

528; 5-ER-1057.

Indeed, to support such an "arguable inference," the August 13, 2018 blogpost would have to be complete corrective disclosure of both the "funding secured" and "Investor support is confirmed…" tweets, yet that is obviously not the case. As Dr. Hartzmark explained, his analysis of the implied volatility for Tesla stock options as well as ongoing discussion regarding investor support and funding for a go-private transaction after August 13, 2018 shows that investors and the market were still being misled by the August 7, 2018 tweets. 3-ER-526-527; 3-ER-561-563. Implied volatility for Tesla stock options did not return to pre-August 7, 2018 levels until August 17, 2018, after the *New York Times* article. 3-ER-536-537. Notably, Mr. Brinkman did not revise his price target and issue a report discounting the August 7, 2018 tweets until August 20, 2018 and in response o the *New York Times* article, not the August 13, 2018 blog post. 6-ER-1084 at 59-69; 4-ER-753. Indeed, as Professor Subramanian testified, to be a fully corrective disclosure, the August 13, 2018 blogpost would have to explicitly state that funding was not yet secured and the August 7, 2018 tweet had been untrue. 2-ER-316. The August 13, 2018 blog post quite obviously did not do this.

Thus, in opposition to the mountain of documents, testimony, and expert analysis presented by Plaintiff all demonstrating the materiality of both August 7, 2018 tweets, the District Court simply cites a single inconclusive data point. This is insufficient under this Court's precedent such as *Weaving*, 763 F.3d at 111, and, accordingly, the order denying Plaintiff's motion on this issue should be reversed.

### D. Mr. Musk's Tweets Also Gave a Reasonable Investor The Impression of a State of Affairs That Differs in a Material Way From the One That Actually Exists.

The District Court also denied Plaintiff's motion for entry of judgment on the issue of materiality on the basis that "the actual state of affairs did not differ from the term 'funding secured' in a way that would be significant to the reasonable investor" and that the tweet "Investor support is confirmed..." was not "*materially* false". 1-ER-3 at 13 (emphasis in original). In doing so, the District Court applied a definition of actionable misrepresentation as a statement that "gives a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." 1-ER-3 at 12 (*citing TSC Industries*, 426 U.S. at 449. This is identical to the test for falsity that the District Court applied to Mr. Musk's August 7, 2018 tweets when considering

Plaintiff's motion for summary judgment on that issue. 1-ER-66 at 21. In its order granting Plaintiff's motion, the District Court stated:

> Based on the evidence of record, the Court finds that no reasonable jury could find the statement "Funding secured" accurate and not misleading. The evidence of record shows that here was nothing concrete about funding coming from he PIF; rather, discussions between Tesla and the PIF were clearly at the preliminary stage. There had been no discussion about what the purchase price would be for a share of stock. Nor had there been any discussion about what percentage of the company the PIF would own or the total amount of money the PIF would contribute.

1-ER-66 at 24. The evidence introduced at trial on this issue was indistinguishable from the record on summary judgment. At summary judgment, the District Court reached a similar conclusion regarding Mr. Musk's statement that "Investor support is confirmed." 1-ER-66 at 26-27. "No reasonable [jury] could conclude that support from the Saudi PIF was confirmed given the preliminary nature of the discussions between the PIF and Tesla." 1-ER-66 at 27. The District Court also noted that Mr. Musk did not reach out to existing Tesla shareholders to get their views on taking the company private until after the tweet had been sent. 1-ER-66 at 26-27.

Thus, it is unclear the precise legal standards the District Court

52

applied at summary judgment and at trial to essentially the same evidentiary record yet reaching opposite conclusions. The trial record, however, shows that the District Court's conclusions at summary judgment were correct and no reasonable jury could conclude that funding was secured or investor support confirmed.

### i. The Statement "Funding Secured" Differed in a Material Way From the Actual State of Affairs.

As set forth above, analysts and investors understood the statement "Funding secured" to indicate a firm, unconditional commitment of funding. Mr. Viecha told analysts that "the first Tweet clearly stated that 'financing is secured.' Yes, there is a firm offer", 4-ER-812; "the offer is as firm as it gets", 4-ER-777; and that "financing is secured regardless of other assumptions", 4-ER-814. Mr. Brinkman, JP Morgan's analyst, concluded that "Either funding is secured or it is not secured, and Tesla's CEO says funding is secured." 4-ER-738. Mr. Fath understood "Funding secured" to mean "To have locked and loaded and no question at all a hundred percent that you have funding ready to go and you're prepared to move forward with the transaction." 6-ER-1167 at 20.

This was consistent with the practice of Mr. Durban, who specializes in go-private transactions, as well as the academic studies by

Professor Subramanian. Both agree that funding is usually committed before any potential go-private transaction is publicly announced. 2-ER-308; 3-ER-445-448.

No offer for funding had been discussed, extended, or agreed as of August 7, 2018, the date of the tweet, or at any point thereafter. Every witness at trial was consistent on this point, including Mr. Musk, 2-ER-329, and Mr. Ahuja, 3-ER-400-401. Mr. Musk had only a preliminary conversation with the Saudi PIF on July 31, 2018. 4-ER-779. This meeting is notable for what did not occur: price was not discussed, structure was not discussed, percentage of ownership by the Saudi PIF was not discussed, and regulatory approvals were not discussed. 4-ER-779; 4-ER-790. Musk did not even intend to use the Saudi PIF to fund all or even a majority of any going private transaction. 3-ER-438; 3-ER-450. Yet this was the only potential source of funding that Musk had spoken to before tweeting out that funding was "secured". Musk knew this.

Not only was the funding not secured or committed, the total amount of funding needed was actually unknowable on August 7, 2018 because it depended on the number of Tesla shareholders who were willing and able to roll their share ownership into a private Tesla. 2-ER-

356 at p. 933; 3-ER-420 at p. 1266. Thus, Mr. Musk publicly stated he had secured funding for a go-private transaction without discussing share price, agreeing on a structure, or even being able to know how much funding was needed. Estimates by Goldman Sachs of potential funding varied by billions of dollars. 5-ER-1027.

The events and conversations transpiring after the July 31, 2018 meeting with the Saudi PIF underscore Plaintiff's point on this issue. On August 10, 2018, three days after the tweet, Silver Lake Partners told Mr. Musk that arranging "committed financing" was the first step in the going private transaction process, meaning that it had yet to be done. 5-ER-906 at 29. Meanwhile, that same day, Mr. Al-Rumayyan on behalf of the Saudi PIF sent Mr. Musk a text expressing interest in "explor[ing] a potential transaction," demonstrating the preliminary posture of their discussions. 4-ER-790 at 8. On August 12, 2018, two days later, Mr. Al-Rumayyan texted Mr. Musk to once again ask for his financial calculations on the transaction, saying "Let's see the numbers and get our people to meet and discuss. We cannot approve something that we don't have sufficient information on." 4-ER-790 at 11. Nothing had been approved by the Saudi PIF as of August 12, 2018 and, therefore, nothing

could have possibly been approved by the Saudi PIF almost a week earlier on August 7, 2018. If the Saudi PIF did not have enough information on August 12, 2018 and had not approved any funding as of that time, there can be no dispute that it had not agreed to provide funding on August 7, 2018.

The ongoing efforts by Silver Lake and Goldman Sachs to raise funding from August 10, 2018 to August 23, 2018 further refute any idea that funding was even close to being secured. Such an exercise would have been completely futile if funding was already secured. Mr. Durban testified that after his August 10, 2018 meeting with Mr. Musk, he spent the next two weeks trying to raise funding. 3-ER-432. When he had his first in-person meeting with Elon Musk on August 10, 2018, he testified that the potential going-private transaction for Tesla was not even yet at "Stage 1" of a typical going-private transaction. 3-ER-435-436; 5-ER-906.

Mr. Durban then testified that as of August 23, 2018, there still was not "any committed financing for any going-private transaction." 3-ER-443. He said that "the full price" and "the amount of capital" needed for taking Tesla private had still not yet been decided as of August 23,

2018. 3-ER-443-444. In fact, Mr. Durban confirmed that neither the "structure," "total amount of capital," "price," nor "the percentage of shareholders who would roll into a private Tesla" was ever finalized. *Id.* at 1373:2-16. Indeed, due to these factors, a "formal proposal" was never sent to the board, and as of August 23, 2018, "there was still substantial uncertainties as to whether a going-private transaction could proceed." 3-ER-443; 3-ER-446; 5-ER-906; 5-ER-955. Silver Lake and Goldman Sachs were just beginning to reach out to potential investors to gauge their interest, including the Saudi PIF. 5-ER-954.

Mr. Dees gave similar testimony. As of August 15, 2018, Mr. Dees said that they "were looking to obtain documentation confirming financing from those investors" and they had not "collected any signed commitment documents from any potential investor in a going-private transaction for Tesla." 3-ER-457. In fact, Mr. Dees indicated that as of August 16, 2018, Goldman Sachs, along with Silver Lake, were still "trying to develop a fully financed proposal." 3-ER-458.

While Mr. Durban and Mr. Dees both advised the Tesla Board their belief that funding for a Tesla go-private transaction was "available", both agreed that this was very different from having funding committed.

Mr. Durban differentiated between an interest in doing a transaction and a commitment to financing one. 3-ER-447. He testified: "an interest is an expression of interest. A commitment is a signed legal document committing you to wire money." Mr. Dees also acknowledged that there was a difference between "funding being available and funding being committed." 3-ER-464.

Presented by a near-identical record, the District Court granted Plaintiff's motion for summary judgment holding that no reasonable juror could find the statement "funding secured" was not misleading. Yet, the District Court denied Plaintiff's motion for judgment as a matter of law. The District Court pointed to testimony that the Saudi PIF had shown previous interest in taking Tesla private and had given Tesla employees the "impression" that there was essentially a "handshake deal" and all that was left was to "work out the details". 1-ER-3 at 13. "Details" included price as well as the actual percentage of Tesla the Saudi PIF would acquire and who else would acquire any remaining percentage required. *Id*. According to the District Court, this still meant that funding was essentially "secured" because the Saudi PIF had ample financing available to it. *Id*. The fact that Mr. Musk had no intention of

using the Saudi PIF to fund the entire transaction, had no way of even knowing how much funding was required and had had no discussions with any other potential source of funding did not, in the District Court's view, prevent funding from being essentially secured for potentially tens of billions of dollars.[4] This finding is incoherent and counterfactual.

As Mr. Durban and Mr. Dees testified, there is a large, material difference between funding being available and funding being committed. It was widely known that there was sufficient capital available in the world to finance a go-private of even a large corporation like Tesla. As Mr. Koney testified, he always understood that there was capital available but it was still important to him that Mr. Musk had stated publicly that funding was secured. 6-ER-1310 at 30; 4-ER-777. The actual phrase used by Mr. Ahuja to describe the Saudi PIF's statements on July 31, 2018 is that it had "expressed interest" in taking Tesla private. 3-ER-

---

[4] The District Court even cited Mr. Musk's desire for many shareholders to roll over their investments into a private Tesla as a reason why funding was essentially "secure". 1-ER-3 at 13. But it was still uncertain whether rolling shareholders into a private Tesla was even feasible and it created enormous uncertainty on the amount of funding needed and the terms on which it could be provided. Thus this aspect of Mr. Musk's proposal made funding less secure not more.

410. As Mr. Durban explained, expressing interest is very different from committing funding. 3-ER-447.

As the District Court stated when granting summary judgment to Plaintiff: "there is some softness to the term 'secured.' But even accepting that there is some room for disagreement as to precisely how secure something must be before the term may be appropriately used, the term is not so elastic as to escape any real meaning." Finding that a preliminary meeting with the Saudi PIF where no price, deal structure, or total amount of funding is discussed is materially the same as "securing financing" strips the phrase of all meaning. The evidence at trial is that investors and analysts were very interested in how Mr. Musk had secured funding for a go-private transaction and understood it to mean more than just identifying potential sources of capital or having preliminary discussions. Under no circumstances could Mr. Musk's preliminary discussions with the Saudi PIF be materially equivalent to being "locked and loaded and no question at all a hundred percent that you have funding ready to go" as understood by Mr. Fath. Certainly Mr. Durban and Mr. Dees did not understand it that way when they spent two weeks trying to identify possible funding sources and begin the

process of obtaining signed commitment letters.

Accordingly, there is no substantial evidence that the status of Mr. Musk's discussions with the Saudi PIF was materially similar to having "funding secured". Plaintiff's motion for judgment as a matter of law on this issue should have been granted.

### ii. "Investor support is confirmed" is materially different from the actual lack of support from Tesla investors for a go-private transaction.

Mr. Musk's statement that "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote" on August 7, 2023 is demonstrably untrue from the evidence of just Mr. Musk himself. By the time he sent the tweet, Mr. Musk had spoken to just one investor about a potential go-private: the Saudi PIF. 2-ER-329. He had not discussed the potential price or structure of a go-private transaction with any investor other than the Tesla Board. By August 23, 2018, Mr. Musk and his representatives had spoken to Tesla investors. As he advised the Tesla Board, "information he had learned in recent weeks following his announcement, including but not limited to, the negative views of many of Tesla's current stockholders regarding the prospect of Tesla going private, the difficulties the Company's current

stockholders would have in continuing to own Tesla's stock if the Company went private . . . ." 2-ER-346-347; 4-ER-785 at 1. Mr. Musk then informed the Tesla Board "that he was withdrawing his offer to try and take [Tesla] private." 4-ER-785 at 4.

In a press release the next day, Mr. Musk and Tesla announced that Tesla was staying a public company. 5-ER-1025. Mr. Musk noted that "given the feedback I've received, it's apparent the most of Tesla's existing shareholders believe we are better off as a public company…. the sentiment, in a nutshell, was 'please don't do this.'" *Id.*

There can be no starker example of a statement giving an impression that is materially different from the actual state of affairs than to make a statement that "investor support is confirmed" for a transaction without speaking to investors and then, just two weeks later after actually speaking to investors, cancelling the transaction for lack of investor support. Yet, the District Court denied Plaintiff's motion for judgment as a matter of law on the materiality of this false statement. 1-ER-3 at 13-14. The District Court felt that testimony regarding "support from the PIF" as well as "confirmation of support for his contemplated transaction from Ron Baron, a significant Tesla investor, as well as Larry

Ellison" was sufficient substantial evidence that the statement was not materially misleading.

Again, this is contrary to the record. It is obvious from the tweet in context that Mr. Musk is not stating that "some investors" support the transaction. Juxtaposed with the statement "Only reason why this is not certain is that its contingent on a shareholder vote", it suggests majority support for the transaction. That is how Mr. Fath interpreted the statement: "with the funding secured Tweet followed by this, that he had it lined up, whatever investors that may be, to support the transaction and be able to take them private." 6-ER-1167 at 32-33. This understanding is obviously materially different to the situation described by Mr. Musk to the Tesla Board on August 23, 2018.

The additional investor support referred to by the District Court is also not supported by the evidence. Mr. Musk had discussed the idea of a go-private transaction with Larry Ellison in 2017 before deciding not to proceed further at that time. He had not discussed any details of the go-private at $420 per share with Mr. Ellison. Mr. Baron sent Mr. Musk an email on August 7, 2018 asking to be considered as part of any go-private transaction. 5-ER-1075. Again, there is no discussion of terms and there

is no evidence Mr. Musk even read the email before sending his tweet. Mr. Baron's funds were included in the list of potential investors prepared on August 16, 2018 for Silver Lake and Goldman Sachs to contact after the tweet about potential interest in a go-private transaction so his support was not confirmed on that date. 5-ER-954. In any event, Mr. Baron;'s funds owned approximately 1% of Tesla in 2018 so even when combined with the Saudi PIF's 5% ownership, it still fell far short of sufficient investor support to take Tesla private. 5-ER-1027 at 10. While Goldman Sachs had made some estimates of potential investor support for a go-private transaction, actual interest was unknown and "we were making assumptions at that point." 3-ER-452.

The District Court's reasoning again fails to rise above a "mere scintilla" of evidence and "speculation" that is insufficient to justify its decision in the face of the substantial evidence that supports just one conclusion: that Mr. Musk's statement "Investor support is confirmed. Only reason why this is not certain is that its contingent on a shareholder vote" was materially false and misleading.

## **CONCLUSION**

For the foregoing reasons, the judgment of the District Court should

be vacated, its order denying Defendants' motion for judgment as a matter of law on materiality should be reversed, and this action remanded for a new trial.

[*Signature blocks on following page*]

Dated: November 27, 2023      Respectfully submitted,

LEVI & KORSINSKY, LLP

 s/ Nicholas Porritt
Nicholas I. Porritt
1101 Vermont Ave NW,
Suite 700
Washington, DC 20005
Tel: (202) 524-4290
Fax: (212) 363-7171

-and-

Adam M. Apton
Adam C. McCall
1160 Battery Street East
Suite 100 - #3425
San Francisco, CA 94111
Tel: (415) 373-1671
Fax: (212) 363-7171

*Counsel for Plaintiff-Appellant
and Lead Counsel for the Class*

66

## **STATEMENT OF RELATED CASES**

To the best of Plaintiff's knowledge, there are no related cases currently pending in the Court of Appeals for the Ninth Circuit.

Dated: November 27, 2023          s/ Nicholas Porritt
                                 Nicholas I. Porritt

## <u>CERTIFICATE OF COMPLIANCE [FORM 8]</u>

_____    This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1. The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

\_\_X\_\_\_    This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 12,453 words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

_____    This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) \_\_ separately represented parties; (2) \_\_ a party or parties filing a single brief in response to multiple briefs; or (3) \_\_ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

_____    This brief complies with the longer length limit authorized by court order dated _____. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

_____    This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

_____    This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

_____ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4. The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: November 27, 2023                    s/ Nicholas I. Porritt
                                                             Nicholas I. Porritt

## **CERTIFICATE OF SERVICE**

I hereby certify that I authorized the electronic filing of the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 27, 2023. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 27, 2023        s/ Nicholas Porritt

                                        Nicholas I. Porritt