# No. 23-16010

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

———— ►►◄◄ ————

IN RE TESLA, INC., SECURITIES LITIGATION

————————

GLENN LITTLETON, LEAD PLAINTIFF

*Plaintiff-Appellant,*

v.

ELON MUSK, TESLA, INC., BRAD W. BUSS, ROBYN DENHOLM, IRA EHRENPREIS,
ANTONIO J. GRACIAS, JAMES MURDOCH, KIMBAL MUSK, AND LINDA JOHNSON RICE

*Defendants-Appellees.*

————————

*On Appeal From The United States District Court
For The Northern District Of California
Honorable Edward M. Chen
No. 3:18-cv-04865-EMC*

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES

Michael Lifrak
Alex Bergjans
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Alex Spiro
Ellyde R. Thompson
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7100

*Counsel for Defendants-Appellees*

January 26, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Tesla, Inc. states that it has no parent company, and no publicly held company owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ...............................................................iv

PRELIMINARY STATEMENT ..........................................................1

COUNTERSTATEMENT OF THE QUESTIONS PRESENTED.........................4

STATEMENT OF THE CASE...........................................................5

    A.    The Underlying Securities Fraud Class Action Lawsuit.......................5

    B.    The District Court's Order On Summary Judgment ............................6

    C.    The Evidence At Trial ...........................................................9

        1.    The Origins Of The Take-Private Transaction Under Consideration ...............................................................9

        2.    Musk's Offer And Initial Follow-Up........................................11

        3.    Musk's Announcement Of The Potential Take-Private Transaction...............................................................12

        4.    The Market Reaction To Information On The Take-Private Transaction ................................................................15

        5.    The Disclosure Of The Information Necessary To Assess The Accuracy Of Musk's Tweets ...........................................16

        6.    Musk's Election Not To Proceed With The Potential Transaction...............................................................19

    D.    The Jury Instructions And Verdict Form ...........................................20

    E.    Plaintiff's Post-Trial Motions...............................................24

SUMMARY OF ARGUMENT .........................................................25

STANDARD OF REVIEW ............................................................27

ii

ARGUMENT ....................................................................................28

I.     Plaintiff Waived And Forfeited Review Of The Jury's Verdict ...................28

II.    Plaintiff Has Not Shown Any Instructional Error ...........................................34

       A.    Plaintiff Failed To Preserve His Claim Of Instructional Error ..........35

       B.    The District Court Properly Instructed The Jury On The
             Element Of Scienter .....................................................37

       C.    Even If Plaintiff Could Show Error, Any Such Error Was
             Harmless ...............................................................41

III.   Plaintiff Cannot Obtain Judgment In His Favor As To The Element Of
       Materiality.......................................................................48

       A.    Plaintiff's Request For Judgment In His Favor As To
             Materiality Is Procedurally Flawed......................................48

       B.    In Any Event, A Reasonable Juror Could Find Plaintiff Failed
             To Prove The Alleged Misstatements Were Materially
             Misleading ...............................................................49

             1.    "Funding Secured" Was Not Materially Misleading...............51

             2.    "Investor Support Confirmed" Was Not Materially False .......56

CONCLUSION ..................................................................................58

REQUEST FOR ORAL ARGUMENT ..................................................59

STATEMENT OF RELATED CASES ..................................................60

CERTIFICATE OF COMPLIANCE..................................................61

CERTIFICATE OF SERVICE ..........................................................62

iii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.D. v. California Highway Patrol*,
  712 F.3d 446 (9th Cir. 2013) ................................................................27

*Allen v. Hylands, Inc.*,
  773 F. App'x 870 (9th Cir. 2019) ...................................................40, 43

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ..................................................................47

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)..............................................................................53

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) .............................................................47

*Baumler v. State Farm Mut. Auto. Ins. Co.*,
  493 F.2d 130 (9th Cir. 1974) ...............................................................29

*Benigni v. City of Hemet*,
  879 F.2d 473 (9th Cir. 1988) ...............................................................43

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ...............................................................53

*Brown v. Rawson-Neal Psychiatric Hosp.*,
  840 F.3d 1146 (9th Cir. 2016) .............................................................33

*Castro v. Cnty. of Los Angeles*,
  833 F.3d 1060 (9th Cir. 2016) .............................................................32

*Crowley v. Epicept Corp.*,
  883 F.3d 739 (9th Cir. 2018) ...............................................................35

*Dunlap v. Liberty Nat. Prods., Inc.*,
  878 F.3d 794 (9th Cir. 2017) ...............................................................41

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................44, 47

iv

*Equate Media, Inc. v. Suthar*,
  2023 WL 7297328 (9th Cir. Nov. 6, 2023) ......................................................29

*Erickson Prods., Inc. v. Kast*,
  921 F.3d 822 (9th Cir. 2019) ...........................................................................43

*Friends of Yosemite Valley v. Kempthorne*,
  520 F.3d 1024 (9th Cir. 2008) .................................................................29, 30

*Gantt v. City of Los Angeles*,
  717 F.3d 702 (9th Cir. 2013) .....................................................................38, 43

*Gebhardt v. SEC*,
  595 F.3d 1034 (9th Cir. 2010) .........................................................................38

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) .....................................................................44, 45

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)..........................................................................................46

*Hardeman v. Monsanto Co.*,
  997 F.3d 941 (9th Cir. 2021) ...........................................................................41

*Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Illinois*,
  421 F.3d 835 (9th Cir. 2005),
  *amended*, 433 F.3d 1089 (9th Cir. 2006)........................................................38

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .........................................................................34

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
  564 U.S. 135 (2011)..........................................................................................33

*Johnson v. Paradise Valley Unified Sch. Dist.*,
  251 F.3d 1222 (9th Cir. 2001) .........................................................................27

*Madrigal v. Allstate Ins. Co.*,
  215 F. Supp. 3d 870 (C.D. Cal. 2016),
  *aff'd sub nom. Madrigal v. Allstate Indem. Co.*,
  697 F. App'x 905 (9th Cir. 2017).....................................................................42

*McCord v. Maguire*,
873 F.2d 1271 (9th Cir. 1989), *amended on other grounds*,
885 F.2d. 650 (9th Cir. 1989) ............................................ 28, 29, 30, 31, 48, 49

*In re McKesson HBOC, Inc. Sec. Litig*.,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................50

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ............................................32

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) ............................................43

*Newton v. Equilon Enters., LLC*,
411 F. Supp. 3d 856 (N.D. Cal. 2019) ............................................29

*Nitco Holding Corp. v. Boujikian*,
491 F.3d 1086 (9th Cir. 2007) ............................................32, 33

*Northpoint Tech., Ltd. v. MDS Am., Inc.*,
413 F.3d 1301 (Fed. Cir. 2005) ............................................30, 48

*Norvell v. BNSF Ry. Co.*,
2023 WL 3299988 (9th Cir. May 8, 2023) ............................................39

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) ............................................44

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000) ............................................53

*Pavao v. Pagay*,
307 F.3d 915 (9th Cir. 2002) ............................................27

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) ............................................28, 37

*Ponce v. SEC*,
345 F.3d 722 (9th Cir. 2003) ............................................38

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ............................................28

*Sanghvi v. City of Claremont*,
    328 F.3d 532 (9th Cir. 2003) ..................................................................36

*SEC v. Phan*,
    500 F.3d 895 (9th Cir. 2007) ..................................................................50

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ................................................................28

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) ................................................................35

*Smith v. City of Oakland*,
    379 F. App'x 647 (9th Cir. 2010) ...........................................................37

*Smith v. Marsh*,
    194 F.3d 1045 (9th Cir. 1999) ................................................................29

*Snake River Valley Elec. Ass'n v. PacifiCorp*,
    357 F.3d 1042 (9th Cir. 2004) ................................................................36

*Spencer v. Peters*,
    857 F.3d 789 (9th Cir. 2017) ..................................................................42

*Swinton v. Potomac Corp.*,
    270 F.3d 794 (9th Cir. 2001) ..................................................................39

*Traver v. Meshriy*,
    627 F.2d 934 (9th Cir. 1980) ..................................................................31

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)....................................................................50, 54, 55

*Unitherm Food Sys. Inc. v. Swift-Eckrich, Inc*,
    546 U.S. 394 (2006)....................................................................32, 33, 34

*Winarto v. Toshiba Am. Elecs. Components, Inc.*,
    274 F.3d 1276 (9th Cir. 2001) ...................................................29, 56, 58

## STATUTES AND REGULATIONS

15 U.S.C. § 78j..........................................................................................4, 5

15 U.S.C. § 78u-4(f)......................................................................................20

15 U.S.C. § 78t(a) ............................................................................6, 20

17 C.F.R. § 240-10b-5 ....................................................................*passim*

## RULES

Fed. R. Civ. P. 50 ...................................................... 24, 25, 32, 34, 46, 53

Fed. R. Civ. P. 51 ................................................................................35

## PRELIMINARY STATEMENT

Class representative and lead Plaintiff Glen Littleton ("Plaintiff") identifies no ground for vacating the judgment in this case, which the district court (Chen, J.) correctly entered in favor of Defendants Elon Musk, Tesla, Inc., and the Director Defendants[1] following the jury's verdict in their favor. Plaintiff raises two narrow issues on appeal, but he cannot establish that either one affected the verdict because Plaintiff does not dispute that he cannot obtain judgment as a matter of law on certain essential elements of his claims against Musk, Tesla, and the Director Defendants unrelated to either of his challenges. The jury's verdict, reached after a ten-day trial, that Plaintiff failed to prove Defendants' liability for securities fraud should stand. This Court should affirm.

This case arises from two tweets that Musk posted in 2018. The tweets concerned the possibility that Musk, the CEO of electric car company Tesla, would take Tesla private. Plaintiff asserted claims for securities fraud against Musk, Tesla, and the Director Defendants based on Musk's tweets stating: "Am considering taking Tesla private at $420. Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." Prior to trial, the district court ruled on summary judgment that

---

[1] "Director Defendants" refers to Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice, members of Tesla's Board of Directors in 2018. 2-ER-155.

these statements were factually false and that Musk had acted recklessly in making them. Beyond falsity and scienter, however, Plaintiff had the burden to prove at trial that the tweets were material as well as the elements of reliance and loss causation. In addition, Plaintiff had to prove that Musk was acting in the course and scope of his employment in order to hold Tesla liable and that the Director Defendants had day-to-day operational control over Tesla to hold them liable. For any defendant the jury found liable, the jury had to determine whether that defendant acted knowingly in order to apportion damages.

Plaintiff does not raise any argument on appeal and did not raise in the district court any argument asserting that he proved loss causation—an essential element of his claim. This failure alone forecloses Plaintiff from obtaining a new trial and renders irrelevant his request for judgment in his favor on the issue of materiality. Likewise, Plaintiff does not contend that the jury could conclude only that Musk acted within the course and scope of his employment or that the Director Defendants had the ability to control Musk, providing yet another reason why the judgment in favor of Tesla and the Director Defendants cannot be disturbed.

Beyond that, ample evidence supports the jury's verdict. Specifically as to materiality, the trial evidence established that the representations in the tweets did not differ in any material respect from the actual state of affairs. When Musk disclosed the details underlying his statements in a blog post published six days

2

after they were made, Tesla's stock price *increased*. No witness testified that Musk would be unable to obtain funding to take Tesla private. Instead, the evidence showed that Musk had discussed taking Tesla private with a foreign sovereign wealth fund days before his tweets. The fund—which already had acquired a nearly five percent stake in Tesla—made a "strong verbal commitment" and entered into a "handshake deal" to fund a take-private transaction.

Likewise, Plaintiff has identified no instructional error, and certainly not an error that prejudiced him. The district court properly instructed the jury that scienter could be established through "reckless disregard" for whether the statements were true. It also instructed the jury to assume that Musk acted with reckless disregard. As Plaintiff's counsel stated during summation, these instructions were "very clear" and mandated that the jury find that Plaintiff proved the element. Plaintiff objects to only one snippet of the instructions regarding whether Musk acted knowingly, but does not dispute that the jury would have had to determine whether Musk acted knowingly in order to apportion damages. The single sentence that Plaintiff challenges—and the instructions as a whole—were correct. Even were Plaintiff able to identify any error, Plaintiff cannot possibly show such error affected the verdict because he does not assert error or seek judgment in his favor on other elements he had to prove.

This Court should affirm.

3

## **COUNTERSTATEMENT OF THE QUESTIONS PRESENTED**

1.      Whether Plaintiff is foreclosed from obtaining a new trial or judgment in his favor on any single element of his claim that Musk violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240-10b-5, because Plaintiff did not to move for judgment in his favor on each of the remaining elements of his claims or raise error with regard to instructions on those elements.

2.      Whether the district court correctly instructed the jury on the element of scienter when it told the jury that scienter could be established through reckless disregard or knowledge of the falsity of the representation and to assume Musk acted with reckless disregard, and whether any instructional error would be harmless because scienter was not contested at trial and ample evidence supports the jury's verdict that Plaintiff failed to carry his burden on other elements of his Rule 10b-5 claims.

3.      Whether the district court correctly declined to enter judgment in favor of Plaintiff on the materiality element of his Rule 10b-5 claims when Plaintiff elected not to move for judgment in his favor on the remaining elements of his claims and substantial evidence supported the jury verdict.

## <u>STATEMENT OF THE CASE</u>

### A.    The Underlying Securities Fraud Class Action Lawsuit

Plaintiff brought claims against Musk and Tesla for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240-10b-5, based on two tweets that Musk published from his Twitter account in 2018.  Plaintiff represented a class of all individuals and entities who purchased or sold Tesla securities from 12:48 p.m. EST on August 7, 2018—when Musk published the first tweet—to August 17, 2018.  7-ER-1404.

Tesla, a public company, is one of the world's leading electric vehicle manufacturers.  2-SER-168.  Musk, now and in 2018, was the CEO of Tesla, the CEO of SpaceX, and the founder of Neuralink and the Boring Company.  2-SER-243; 2-ER-114.

On August 7, 2018, Musk posted "Am considering taking Tesla private at $420.  Funding secured" and "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote."  4-ER-734; 4-ER-737. Plaintiff asserted that such statements violated the securities laws because they created a misleading "impression to the public that it was virtually certain that Musk could take Tesla private at $420 per share, that funding for this multi-billion transaction had been secured, and that the only remaining contingency was a shareholder vote" and because investors trading on these alleged misstatements

5

suffered losses.  2-ER-101-02.  Plaintiff did not argue at trial that the first half of the tweet "[a]m considering taking Tesla private at $420" was untrue.  2-SER-159-162; 2-SER-382-83.

Plaintiff asserted a Rule 10b-5 claim against Tesla based only on the theory that Musk's alleged violations were imputed to the corporation.  1-ER-49; 2-ER-147-148; 1-SER-60.  Plaintiff also asserted that members of Tesla's Board of Directors were liable under Section 20(a) of the Securities Exchange Act as control persons, but alleged no independently wrongful conduct.  7-ER-1404.  At trial, Plaintiff did not allege any other statements violated securities law.  1-ER-29-30.  Nor did Plaintiff allege that any other Tesla officer or employee violated Rule 10b-5.  1-ER-29-30; 1-ER-49.

According to Plaintiff, the alleged misrepresentations in the tweets caused Tesla's stock price to become artificially inflated for a ten-day class period from the day the tweets were posted on August 7, 2018 to August 17, 2018—the day after the *New York Times* published an article about Musk that included a reporter's comment that funding for the take-private transaction was "far from secure."  7-ER-1403.

## B.    The District Court's Order On Summary Judgment

Before trial, the district court granted partial summary judgment in favor of Plaintiff on the issues of falsity and scienter.  1-ER-97-98.  Specifically, the district

court concluded that the statements in Musk's August 7 tweets—"Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."—were false and made recklessly. 1-ER-88-93.

The district court declined to grant summary judgment for Plaintiff on the element of reliance under the fraud-on-the-market presumption, by which a Plaintiff can avail himself of a presumption that investors relied on the statements. 1-ER-95-97. The district court instead determined that triable issues of fact existed on the question of materiality and Defendants' ability to rebut the presumption. 1-ER-95-96. Specifically, on August 13, 2018, three days before publication of the *New York Times* article that Plaintiff alleged was the corrective disclosure (and thus ended the class period), Musk published a blog post that disclosed to the market the details underlying his tweets. 1-ER-78-79 ("August 13 Blog Post"). Musk explained in the August 13 Blog Post that he had not yet prepared a detailed proposal for a take-private transaction, that the nature and source of funding remained uncertain, that he was still communicating with potential investors, and that many steps remained before any final decision was made to take Tesla private, including an "evaluation process" by a special committee of Tesla's Board, necessary regulatory approvals, and a shareholder vote. 1-ER-79-80.

In response to the August 13 Blog Post—which disclosed that no funding had been committed, no structure had been determined, no final investor group identified, and that a number of contingencies remained—Tesla's share price increased from approximately $355 per share to $361 per share. 2-SER-395.

On summary judgment, the district court determined that "there is evidence suggesting that the misrepresentations [at issue] did not actually affect the market price" of Tesla securities because "there is evidence that, after the 8/13/2018 blog post, which served as a partial corrective disclosure, there was no decline or at least not a significant decline in stock price; thus, arguably, the reaction to the tweets on 8/7/2018 was a response to Mr. Musk contemplating taking Tesla private and not to statements that, e.g., funding was secured or investor support confirmed." 1-ER-97.

Defendants moved for reconsideration of the district court's order. 1-SER-112. At the hearing on Defendants' motion, the district court made clear that it determined only that the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote" were "false statement[s] . . . in a literal sense, not in a legal sense." 1-SER-135. To avoid any doubt, the district court stated: "To be clear, I did not find materiality with respect to the misrepresentation or a reckless disregard or knowingly scienter with regard to any such material representation."

1-SER-136. In its order following the hearing, the district court noted that "[a] statement can be factually false but not material." 1-ER-64.

### C. The Evidence At Trial

Given the district court's ruling on summary judgment, the evidence at trial focused on whether the statements were material—that is, whether they gave "a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists" and whether "there was a substantial likelihood that a reasonable investor would consider" that difference "important in deciding whether to buy or sell that security," 1-ER-47—and whether Plaintiff could prove loss causation.

### 1. The Origins Of The Take-Private Transaction Under Consideration

The evidence at trial showed that, days before Musk tweeted he was contemplating taking Tesla private, Musk emailed the Board of Directors to offer to take Tesla private at $420 per share. 4-ER-782. The price reflected an approximately twenty percent premium of Tesla's then-share price. 3-SER-452. Musk noted in his offer that he "fully support[s] any shareholders who wish to remain shareholders of Tesla as a private company retaining their shares" and that the "offer is just for those who do not wish to remain shareholders of Tesla as a private company." 4-ER-782.

Musk sent this email only days after meeting with the Saudi Arabia Public Investment Fund ("PIF")—one of the largest sovereign wealth funds in the world, with hundreds of billions of dollars in assets under management. 2-SER-224-25; 2-SER-305. As multiple witnesses testified, during that July 31, 2018 meeting that Musk, Tesla's CFO Deepak Ahuja, and Sam Teller (Musk's chief of staff) attended with the PIF at Tesla's Fremont factory, the PIF revealed to Musk that it had acquired nearly five percent of Tesla's stock—a multi-billion dollar holding. 3-SER-448; 2-SER-293.

At the meeting, the PIF reiterated its interest in taking Tesla private. The participants discussed the potential size, cost (around $30 billion to purchase 50 percent of Tesla's stock), and structure of the transaction—with Musk expressing a preference that Tesla's existing shareholders be given the opportunity to retain their shares in a private Tesla. 2-SER-290-93; 3-ER-579. During the meeting, the PIF indicated it was "ready to act" and take the necessary steps to fund a take-private transaction. 2-SER-291; 2-SER-306-07. Everyone who attended the meeting on Tesla's side understood that the PIF had made a "very serious verbal commitment" to fund the take-private transaction, that the PIF and Musk had a "handshake deal" in principle to take Tesla private, and that all that was left was to work out the details. 3-SER-306-07; 3-ER-581-82. On a tour of the factory after the meeting, the PIF's managing director communicated to Tesla's CFO Ahuja that

the PIF was prepared to fund the entire take-private transaction on its own. 3-SER-308-09.

Indeed, the PIF had told Musk eighteen months earlier that it was interested in providing funding to take Tesla private. 2-SER-420-23. During multiple meetings among the PIF, Musk, and others, the PIF's managing director repeatedly expressed interest in providing full financing to take Tesla private. 2-SER-420-23. The PIF indicated it was interested in investing around $60 billion to take Tesla private. 2-SER-297-99. Musk previously had told the PIF in 2017 that, if it was interested in taking Tesla private, it should first purchase significant shares in Tesla on the public market to demonstrate its seriousness—which is precisely what the PIF eventually did. 2-SER-423-24; 3-SER-448.

## 2. Musk's Offer And Initial Follow-Up

Two days after the July 31, 2018 meeting with the PIF, Musk sent his email to the Board of Directors to offer to take Tesla private. 4-ER-782. In response to Musk's offer, the Board held a Special Meeting without Musk that same day. 3-SER-449. Ahuja attended the meeting and informed the Board of the PIF's prior expressions of interest in taking Tesla private, its acquisition of 4.9 percent of Tesla's stock, and its apparent willingness "to fund the entire transaction." 3-SER-449. The Board held another Special Meeting the following day, this time inviting Musk. 3-SER-451. At that meeting—days before Musk posted his August 7

tweets—Musk informed the Board that "the PIF indicated that it was willing to fund the entire going-private transaction" and that "more than enough capital [was] available to take the company private." 3-SER-452. Musk discussed the structure of the proposed take-private transaction, noting that his intention was "to have ownership of [Tesla] dispersed over a broad base of shareholders, including many of [Tesla's] current shareholders." 3-SER-452. The Board authorized Musk to have conversations with Tesla's top shareholders to gauge interest in the proposed transaction. 3-SER-453.

### 3. Musk's Announcement Of The Potential Take-Private Transaction

On the morning of August 7, 2018, *The Financial Times* informed Tesla that it intended to publish an article reporting that the PIF made a large purchase of Tesla's stock. 3-SER-454; 2-SER-230. Concerned that other details from his meeting with the PIF would leak, Musk published his first tweet: "Am considering taking Tesla private at $420. Funding secured." 2-SER-230; 4-ER-782. Tesla's shares rose when Musk announced he was "considering taking Tesla private at $420"—an admittedly true statement. 4-ER-782; 2-SER-383.

Following the first tweet, Musk published a series of tweets that outlined the preferred structure of the potential transaction and indicated it was in a nascent stage. 3-SER-445-47. Musk also published a blog post that same day discussing the potential transaction, stating that "a final decision has not yet been made" and

12

that he "would like to structure this so that all shareholders have a choice" whether to remain investors in Tesla. 4-ER-735. Musk retweeted and linked to the blog post in his second tweet, which stated "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." 4-ER-737. Prior to publishing this tweet, Musk had received a message of interest and support from a major Tesla investor. 5-ER-1075.

But confusion arose as to the meaning of the phrase "[f]unding secured" since it is not a financial term of art. 2-SER-347. Plaintiff Glen Littleton testified that he understood "[f]unding secured" to be consistent with the fact that "the PIF had strongly expressed their support, and that a deal—[Mr. Musk] thought a deal could be closed." 2-SER-191. Another investor, Timothy Fries, testified that the phrase indicated that "there was some vetting" of the potential funding source. 2-SER-211. Goldman Sachs' head of investment banking, Dan Dees, testified that he thought "[f]unding secured" meant "that [Musk] was in touch with the capital required" and that "he had a line of sight towards it." 2-SER-358. At the time he published the tweet, Musk had not only been in touch with the PIF—from whom he received a "serious verbal commitment" to fund the transaction—but also understood that he could use his vast personal wealth and tens of billions of dollars in SpaceX stock as funding. 2-SER-219-20; 2-SER-307.

13

Even analysts who were uncertain as to what "[f]unding secured" meant understood "that the money was out there for [Tesla] to go private" and were "never concerned about [Tesla's] ability" to do so. 6-ER-1332-1334.

When Musk met with Egon Durban of Silver Lake Partners on August 10, 2018 to discuss the transaction, Durban—an experienced private equity investor and advisor who led the largest take-private in history for Dell Inc., 2-SER-213— concluded that funding would not be an obstacle because Musk could "raise funding easily," 2-SER-348. Musk received numerous offers from potential investors while the two met and Silver Lake's largest investor—with tens of billions of dollars in available capital—made an unsolicited offer to invest in the potential transaction. 2-SER-349-51. Later, on August 22, 2018, Durban communicated with the PIF, which confirmed it retained a "deep interest" in providing funding for the take-private. 2-SER-351-52. Durban understood that there was "more than enough interest and funding to execute on the transaction" and that funding was not going to be an issue. 2-SER-353.

Goldman Sachs indicated to Musk in an August 10 presentation regarding the potential take-private structure that more than sixty percent of Tesla shares owned by current investors would roll over into a private Tesla. 5-ER-1031; 2-SER-260-61; 2-SER-354-55. Dees from Goldman Sachs concluded that there was "ample funding available for the transaction." 2-SER-358.

14

**4.    The Market Reaction To Information On The Take-Private Transaction**

Following Musk's tweets, Tesla's share price increased.  But Plaintiff's loss causation and damages expert Michael Hartzmark admitted that he made no attempt to separate the price impact of the undisputedly true statement that Musk was "considering taking Tesla private at $420" from the allegedly false statement "[f]unding secured."  2-SER-383-85.  Plaintiff offered no "empirical" evidence that the increase in stock price was caused by the allegedly false statement, as opposed to the true announcement of Musk contemplating such a transaction.  2-SER-383-85.

Nor did Plaintiff offer any empirical evidence separating the price impact of the second alleged misstatement from Musk's true statement, 2-SER-387, or separate the price impact of the two challenged tweets from the other tweets and blog post Musk issued on August 7, 3-ER-513-514; 3-ER-534-535.  Instead, Hartzmark treated all of Musk's statements on August 7, 2018—including the announcement he was considering such a transaction, the tweets discussing the structure of the potential transaction, and the August 7 blog post—as an "interwoven bundle" and analyzed all of them together.  2-SER-384-87.  Hartzmark also admitted that the announcement of a "potential deal at a premium to the market price" alone would be expected to increase a stock's price.  2-SER-387-88.

Similarly, Plaintiff's options expert Steven Heston admitted that, had Musk only tweeted the true statement "Am considering taking Tesla private at $420," and nothing else, that options market would have had the "same exact movement" as it did when Musk posted the tweets at issue. 3-ER-486-487.

### 5. The Disclosure Of The Information Necessary To Assess The Accuracy Of Musk's Tweets

On August 13, 2018, Musk published a blog post on Tesla's website titled "Update on Taking Tesla Private." 4-ER-775. The August 13 Blog Post included a section titled "Why did I say 'funding secured'" in which Musk described his interactions with the PIF, including the July 31, 2018 meeting. 4-ER-775. Musk wrote that, during his meeting with the PIF, its managing director "expressed his support for funding a going private transaction for Tesla at this time" and that "I understood from him that no other decision makers were needed and that they were eager to proceed." 4-ER-775. Musk explained, "I left the July 31st meeting with no question that a deal with the [PIF] could be closed, and that it was just a matter of getting the process moving. That is why I referred to 'funding secured' in the August 7th announcement." 4-ER-775-76. Musk disclosed that he "continued to communicate" with the PIF and that the PIF "expressed support for proceeding subject to financial and other due diligence" and "asked for additional details on how the company would be taken private, including any required percentages and regulatory requirements." 4-ER-776.

The August 13 Blog Post also included a section "What are the next steps?" There, Musk wrote that he "engaged advisors to investigate a range of potential structures and options" and that "[i]f and when a final proposal is presented, an appropriate evaluation process will be taken by a special committee of Tesla's board." 4-ER-776. If the Board were to approve the plan, "any required regulatory approvals will need to be obtained and the plan will be presented to Tesla's shareholders for a vote." 4-ER-776.

Plaintiff did not allege at trial that the August 13 Blog Post contained any actionable misrepresentations. 7-ER-1416-18; 1-ER-29-30. Instead, Plaintiff's experts testified that the August 13 Blog Post revealed that Musk's statement "[f]unding secured" was inaccurate. 2-SER-215; 2-SER-394. As Plaintiff's other expert, Harvard Professor Guhan Subramanian, testified, the August 13 Blog Post "indicates that funding was not secured." 2-SER-215. Hartzmark opined that the Blog Post communicated to the market that the statement was "premature at best." 2-SER-394. And he agreed that the jury could have decided that the August 13 Blog Post "fully reveal[ed] the truth about the 'funding secured' tweet." 3-SER-395.

Yet, despite the fact that the August 13 Blog Post revealed this information necessary to assess the accuracy of Musk's statements, Tesla's share price did not drop—instead, it increased after publication of the blog post. 3-SER-395.

At the same time, Littleton, the lead plaintiff, believed that the facts revealed in the August 13 Blog Post were consistent with his understanding of "[f]unding secured." 2-SER-190-91. He testified that "nothing" in the August 13 Blog Post "changed [his] view that funding was secured for a go-to private transaction at 420" and that "the facts that were in [the] blog post . . . confirmed to [him] one version of 'Funding secured.'" 2-SER-191. Littleton also testified that the information revealed in the Blog Post did not change his assessment as to whether Musk would be able to take Tesla private. 2-SER-184. Other market participants had similar reactions. *E.g.,* 6-ER-1357-1358 (analyst testifying the August 13 Blog Post "did not make me think it was less likely funding was available").

Although the PIF indicated in a text message to Musk that the August 13 Blog Post was "ill-advised" and contained "loose information," the PIF at the same time asked for "information" to "move forward" with the transaction. 4-ER-802.

Despite the disclosure of this information on August 13, Plaintiff contended that the market did not have the information necessary to determine the accuracy of Musk's tweets until the publication of an August 16, 2018 *New York Times* article. 7-ER-1403. The fourteenth paragraph of that article referred to Musk's first August 7 tweet and stated that "funding . . . was far from secure." 4-ER-825. The article described the July 31 meeting with the PIF and noted that the PIF "had not committed to provide any cash"—a fact that Musk had disclosed in the August 13

18

Blog Post. *Compare* 4-ER-825 *with* 4-ER-775. But the crux of the article was not about the disclosure of any new information about the transaction, but rather Musk's "fraying" mental state. 4-ER-824. Following the article's publication, a number of major investors expressed concern about Musk's mental and physical health "given [his] exhaustion" and communicated that they were "spooked" by the statements Musk made about his personal pain. 2-SER-280-84; 4-ER-822-23. Tesla's share price fell the day after the article was published. 3-ER-530.

### 6. Musk's Election Not To Proceed With The Potential Transaction

On August 23, 2018, after meeting with his advisors, Musk informed the Board of Directors that he would not move forward with the take-private because many of Tesla's shareholders preferred that the company remain public. 4-ER-788. Musk's advisors, who also attended the meeting, confirmed that "there was more than enough interest and funding to execute" the take-private transaction. 4-ER-787. Dees and Durban echoed this assessment in their sworn testimony. 2-SER-353; 2-SER-358. The following day, Musk published a blog post announcing his decision. 5-ER-1025. Consistent with his August 7 tweet that any take-private transaction was "contingent" on shareholder support, Musk explained that he made his decision after it became "apparent that most of Tesla's existing shareholders believe we are better off as a public company." 5-ER-1025.

### D.   The Jury Instructions And Verdict Form

At trial, Plaintiff bore the burden to prove the elements of his Rule 10b-5 claims against Musk and Tesla that the district court had not already decided in favor of Plaintiff at the summary judgment stage.  1-ER-44.  Thus, Plaintiff had to prove that Musk made untrue statements of a material fact in connection with the purchase or sale of securities, through an instrument of interstate commerce, that Plaintiff justifiably relied on such untrue statements of material fact in buying or selling Tesla securities, and loss causation.  1-ER-44.  Plaintiff also bore the burden to prove his Section 20(a) claim against each of the Director Defendants.  1-ER-55.

In the event that the jury found any defendant liable, it had to apportion responsibility among those defendants it had found liable.  1-ER-57.  As part of the apportionment analysis, the jury was instructed that it "must determine whether any Defendant knowingly violated any securities law," 1-ER-57, because defendants who knowingly violate securities laws are jointly and severally liable for the entire judgment while those who act only in reckless disregard are liable for damages only in proportion to their assigned responsibility, 1-ER-57; 15 U.S.C. § 78u-4(f).  Thus, the jury would have had to determine whether Musk acted knowingly in order to apportion liability.  1-ER-57; 7-ER-1424-25.

Before trial, the parties submitted proposed jury instructions. 1-SER-78. Despite the district court's summary judgment order on scienter, Plaintiff tendered proposed instructions that included scienter as a required element of the Rule 10b-5 claim and defined scienter as either knowledge that the statement at issue was false or reckless disregard for such falsity. 1-SER-81-83.

The Court gave the following instructions relating to scienter, for which Plaintiff challenges on appeal only the underlined portions:

> "Plaintiff alleges that Elon Musk and Tesla, Inc. violated Rule 10b-5 and harmed investors by making materially false and misleading statements about a proposed going-private transaction and its financing. This is referred to as 'Plaintiff's 10b-5 claim.'
>
> On this claim, Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:
>
> . . .
>
> 2) Elon Musk and/or Tesla acted with the necessary state of mind (i.e., knowingly or with reckless disregard for the truth or falsity of the statements)
>
> . . .
>
> You are to assume that the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." were untrue. But you still must decide whether these statements were of material facts. You must also assume Mr. Musk acted with reckless disregard for whether the statements were true. <u>But you must still decide whether he knew that the statements were untrue</u>." 1-ER-44-45.

21

*Final Instruction No. 9*:

> "Plaintiff must prove by a preponderance of the evidence that Elon Musk and/or Tesla acted with the necessary state of mind, which is known as scienter. Scienter may be established by showing either:
>
> 1. The defendant knew his untrue statement was false, or
>
> 2. The defendant had reckless disregard for whether the statement was true.
>
> "Reckless" means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it.
>
> You are to assume that Elon Musk made the statements "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." with at least reckless disregard for whether the statements were true. <u>But you must still decide whether Mr. Musk acted knowingly</u>." 1-ER-48.

The district court also issued a cautionary instruction, to which Plaintiff did not object at trial. 2-SER-204-05; 2-SER-208. Plaintiff now challenges the underlined portion of that instruction on appeal.

> "You will hear testimony regarding the circumstances and communications relating to the two tweets by Elon Musk on August 7th, 2018 and Mr. Musk's state of mind as to those tweets.
>
> As I've stated, you are to assume that the statements, quote, 'funding secured,' close end, and quote, 'Investor support is confirmed. Only reason why this is not certain

is that it's contingent on a shareholder vote,' close quote, were untrue. Therefore, the evidence is not to be used to determine whether the statements were untrue.

Rather, <u>such evidence may be relevant to other issues on which the plaintiff has the burden of proof, such as whether Mr. Musk knew the statements were untrue when he made them</u> and/or whether the untrue statements gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed." 2-ER-285-86

In his initial objections to the Court's jury instructions, Plaintiff proposed instructions for the Rule 10b-5 claim and scienter that mirrored much of the language that Plaintiff now contends was erroneous. 1-SER-65; 1-SER-64 (proposing that the court instruct the jury that "You must still decide whether he knew that the statements were false.").

At trial, Defendants did not contest the element of scienter. During opening statements, Defendants' counsel admitted in accordance with the district court's summary judgment ruling that Musk had been reckless. 2-SER-166. In summation, Defendants did not argue scienter at all or make reference to the scienter jury instruction. 4-ER-711-14. By contrast, Plaintiff's counsel repeatedly informed the jury in closing that "the Court has instructed you to accept that Elon Musk acted with reckless disregard to the truth of both these tweets, which is sufficient to meet the state of mind for this element. You are to assume this element is met." 4-ER-626-27; *see also* 4-ER-608-09.

**E.     Plaintiff's Post-Trial Motions**

After less than two hours of deliberation, the jury found in favor of Defendants on both of Plaintiff's Rule 10b-5 claims.  1-ER-29-30; 2-SER-442.

Plaintiff moved for judgment as a matter of law or, alternatively, for a new trial on damages.  1-SER-3-4.  Plaintiff renewed his Rule 50(a) motion as to the issues of materiality, class-wide reliance, and individual reliance.  1-SER-3-4; 1-SER-36-37.  He did not move for judgment as a matter of law on the required elements of loss causation or instrument of interstate commerce and thus did not move for judgment as to his Rule 10b-5 claims in their entirety.  1-SER-3-4.

Plaintiff also moved for a new trial on damages based on instructional error.  1-SER-28-32.  Plaintiff did not move for a new trial on liability.  1-SER-3-4.

The district court denied Plaintiff's motion for judgment as a matter of law and for a new trial on damages.  1-ER-27.  The district court concluded that it could not enter judgment as a matter of law for Plaintiff on his Rule 10b-5 claims because Plaintiff did not move for judgment on the element of loss causation, limiting the district court's review of the verdict and precluding it from entering judgment.  1-ER-13-14.  The district court also denied Plaintiff's motion for judgment as a matter of law on materiality and reliance on the merits because substantial evidence supported the verdict that Plaintiff failed to meet his burden of proof on those elements.  1-ER-14-18.

The district court also denied Plaintiff's motion for new trial on damages. The district court determined that the verdict was not against the clear weight of the evidence because, for instance, the jury could have reasonably found Plaintiff failed to prove loss causation. 1-ER-19. And the district court rejected Plaintiff's instructional error argument, holding that that Final Jury Instructions Nos. 6 and 9 did not misstate the law, 1-ER-19-22, and "expressly conveyed that scienter had been established for the Section 10b-5 claim," 1-ER-22.

## SUMMARY OF ARGUMENT

At the threshold, this Court should affirm the district court's judgment because Plaintiff has waived and forfeited any ability to seek reversal or vacatur of the judgment on review.

At trial, Plaintiff bore the burden to prove each element of his Rule 10b-5 claims that had not been decided on summary judgment, including loss causation. The jury therefore could have found for Defendants if it determined that Plaintiff failed to prove any of those essential elements of his claims. Here, the jury issued a general verdict—as Plaintiff proposed. As a result, this Court must uphold the verdict if any alternative theory for the jury's determination is supported by sufficient evidence.

Here, Plaintiff did not challenge the verdict as to each element of his claims—either in his Rule 50 motions in the district court or on appeal. And he

asserted instructional error only as to a single element—scienter—which the parties did not dispute had been met. As a result, Plaintiff cannot obtain reversal or vacatur of the jury's verdict. The Court may affirm on this basis alone, without reaching Plaintiff's arguments as to instructional error or the sufficiency of the evidence as to materiality.

If the Court does reach the instructional error argument, it should conclude the district court's instructions were correct, that Plaintiff failed to preserve any challenge to the instruction, and that the instruction did not result in any prejudice, even if it were incorrect. The instructions correctly stated the law of scienter, in line with Plaintiff's own proposed instruction that scienter can be based on either reckless disregard or knowledge of the falsity of a statement. The instruction then told the jury to assume this element met. At trial, Plaintiff's counsel repeatedly informed the jury without contradiction that it was instructed to find for Plaintiff on scienter and explained that the instructions were "very clear" that Plaintiff had no burden to prove knowledge.

For this reason, even if there were any error, it would have been harmless because it did not result in any reasonable risk of confusion. Defendants did not contest that Plaintiff proved scienter and the jury had ample evidence from which to conclude that Plaintiff failed to meet his burden on the elements that Defendants did contest at trial.

Finally, no reason exists to consider Plaintiff's limited request for judgment in his favor as to materiality because judgment as to this single element would not change the jury's conclusion. But, if the Court does consider it, substantial evidence supports the conclusion that the jury was not compelled to find Plaintiff had proved this element. The jury had to determine whether Plaintiff had proved that the difference between Musk's tweets and the actual state of affairs was important to investors. But, when Musk disclosed additional details regarding the statements in this tweets, Tesla's stock price increased. Thus, Plaintiff cannot show that any reasonable jury could only have concluded that Plaintiff satisfied this element.

## STANDARD OF REVIEW

This Court "review[s] de novo the grant or denial of a renewed motion for judgment as a matter of law." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

This Court "give[s] significant deference to the jury's verdict and to the nonmoving parties . . . when deciding whether that decision was correct." *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). The "jury's verdict must be upheld if it is supported by substantial evidence," *i.e.*, "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). In making this determination, the

27

Court "may not substitute its view of the evidence for that of the jury," *id.*, and "must draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

This Court "review[s] a district court's formulation of civil jury instructions for abuse of discretion, but . . . review[s] de novo whether an instruction states the law correctly." *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (citation omitted).

## **ARGUMENT**

## I. **PLAINTIFF WAIVED AND FORFEITED REVIEW OF THE JURY'S VERDICT**

While Plaintiff seeks a new trial based on purported instructional error as to scienter and judgment as to materiality, Plaintiff does not assert any instructional error or seek judgment in his favor as to certain other essential elements. As a result, Plaintiff has conceded the existence of a valid basis for the jury's verdict of no liability and the Court need not consider his narrow challenges to the verdict.

Where a general verdict encompasses multiple factual theories, this Court "will uphold the verdict if the evidence is sufficient with respect to any of the allegations." *McCord v. Maguire*, 873 F.2d 1271, 1273-74 (9th Cir. 1989), *amended on other grounds by* 885 F.2d. 650 (9th Cir. 1989); *see also SEC v. Todd*, 642 F.3d 1207, 1213 n.1 (9th Cir. 2011) (on motion for judgment as a matter of law and new trial of Rule 10b-5 claim, where multiple independent factual bases

supported the jury verdict, reviewing sufficiency of evidence for all bases was not necessary to affirm) (*citing McCord*); *Baumler v. State Farm Mut. Auto. Ins. Co.*, 493 F.2d 130, 134 (9th Cir. 1974) ("where there are . . . alternative factual theories which might support the verdict, the verdict will be upheld if there is sufficient evidence to support either theory."); *Equate Media, Inc. v. Suthar*, 2023 WL 7297328, at *1 (9th Cir. Nov. 6, 2023); *Newton v. Equilon Enters.*, *LLC*, 411 F. Supp. 3d 856, 865 (N.D. Cal. 2019) ("Where multiple theories could support the verdict, sufficient evidence as to any of one of them will defeat a motion for new trial."). The Court can disturb a verdict "***only if***, under the governing law, there can be but one reasonable conclusion as the verdict," *i.e.*, "there is ***no*** legally sufficient basis for a reasonable jury to find for that party on that issue." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (emphasis added).

*First*, Plaintiff has waived any argument that the jury could reach only one conclusion by not arguing on appeal that he is entitled to judgment in his favor on loss causation or reliance. "Arguments not raised by a party in its opening brief are deemed waived." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) (*citing Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999)). Defendants argued they were not liable for violating Rule 10b-5 on multiple grounds, including that Plaintiff failed to carry his burden to prove the elements of

materiality, reliance, ***and*** loss causation.  *E.g.,* 4-ER-711-14; 1-ER-44 (instructing jury as to required elements of a Rule 10b-5 claim).  But Plaintiff does not argue that the jury lacked sufficient evidence to reject his Rule 10b-5 claims on the theory that he failed to meet his burden to prove loss causation.  Nor has he contended on appeal that the district court committed any legal error relating to that element.

By failing to raise any challenge to loss causation in this appeal, Plaintiff has waived and abandoned any argument that the jury's verdict cannot be upheld on the alternative theory that Plaintiff failed to prove loss causation.  *Friends of Yosemite*, 520 F.3d at 1033.  Through such waiver, Plaintiff has conceded that sufficient evidence supports at least one of the potential theories for the jury's general verdict and, accordingly, this Court must uphold the verdict and affirm the judgment.  *McCord*, 873 F.2d at 1273-74; *see also Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1311 (Fed. Cir. 2005) (citing *McCord* and concluding that "[a] failure of proof with respect to any single item of evidence does not justify a grant of either JMOL or a new trial . . . because the critical question is whether the evidence, taken as a whole, was sufficient to support the jury's verdict.").

The Court's analysis of Plaintiff's entire appeal can and should stop here. *McCord* is directly on point.  In *McCord*, the jury entered a general verdict and the

losing party sought a new trial, arguing that insufficient evidence supported four of the eight theories on which the verdict may have rested. *Id*. at 1272-73. This Court rejected the appeal and affirmed the judgment without even analyzing the merits of the four challenged theories because "even if one or more of the" challenged theories "were unsubstantiated, [the Court] must uphold the general verdict so long as it was sufficiently supported by at least one" of the alternative theories. *Id*. at 1274. Because the appellant there did not challenge the sufficiency of the evidence supporting at least one of the alternative theories, the court had no choice but to uphold the verdict, affirm the judgment, and refuse the request for a new trial without even reaching the merits of the challenge. *Id.* at 1273-74.

The same is true here. Because Plaintiff concedes that sufficient evidence supports the jury's verdict that he failed to prove loss causation, does not allege that the district court committed any error of law relating to that element, and can point to no special interrogatory showing that the jury rested its verdict on one of the two elements challenged in this appeal, the judgment must be affirmed. *See id.* at 1273-74; *Traver v. Meshriy*, 627 F.2d 934, 938–39 (9th Cir. 1980) ("[T]he reviewing court has discretion to construe a general verdict as attributable to another theory if it was supported by substantial evidence and was submitted to the jury free from error.").

31

*Second*, Plaintiff forfeited his ability to argue that the verdict lacks sufficient evidentiary support by failing to move on each element of the Rule 10b-5 claims as part of his Rule 50 motions in the district court. "[A] party procedurally defaults a civil appeal based on the alleged insufficiency of the evidence to support the verdict if it fails to file a post-verdict motion for judgment notwithstanding the verdict." *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1088 (9th Cir. 2007) (*citing Unitherm Food Sys. Inc. v. Swift-Eckrich, Inc*, 546 U.S. 394, 404 (2006)). Any such "procedurally barred sufficiency challenge . . . is considered forfeited." *Id.*

At trial, Plaintiff was required to prove all elements of his Rule 10b-5 claims, including loss causation, 1-ER-44; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1065 (9th Cir. 2008) (affirming dismissal of Rule 10b-5 claim for failure to plead loss causation). The district court correctly ruled that, in order to overturn the jury's verdict and obtain judgment as a matter of law on his claims, Plaintiff was required to move under Rule 50(b) on each of the elements of his Rule 10b-5 claim. 1-ER-13. Otherwise, the court cannot determine that "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (quotation omitted).

But Plaintiff did not seek judgment on loss causation or argue that there was no legally sufficient basis from which the jury could have found for Defendants on that element. As a result, Plaintiff "has 'provided no basis for review of [a] sufficiency of the evidence challenge in the Court of Appeals.'" *Nitco Holding Corp.*, 491 F.3d at 1088 (*quoting Unitherm Food Sys*, 546 U.S. at 407).

*Third*, in this same vein, the Court cannot grant a new trial to Plaintiff on his Rule 10b-5 claim against Tesla or his Section 20 claim against the Director Defendants because he neither raised nor articulated any basis for a new trial on those claims in his brief on appeal or in the district court. *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016); *Unitherm*, 546 U.S. at 404 ("[A] party is not entitled to pursue a new trial on appeal unless that party makes an appropriate post-verdict motion in the district court.").

As to Tesla, Plaintiff separately had to prove that Tesla was the "maker" of the tweets, *i.e.*, that it "had ultimate authority over the statement, including its content and whether and how to communicate it," *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141-42 (2011), and that Musk was acting within the scope of his authority as a corporate officer when he published the tweets, 1-ER-46, 1-ER-49. As to the Director Defendants, Plaintiff had to establish that Tesla was liable under Rule 10b-5 and then ***also*** prove each individual director was a "controlling person" under Section 20. 1-ER-55. Because each director was an

"outside director,"[2] Plaintiff had to prove that each was "was active in the day-to-day affairs" of Tesla or "exercised any specific control over the preparation and release" of the statements giving rise to the predicate Rule 10b-5 claim. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 n. 13 (9th Cir. 2000).

The jury found that Plaintiff failed to prove his Rule 10b-5 claims against Tesla, 1-ER-29-30, and Plaintiff does not argue in his Rule 50(b) motion that he proved the additional elements necessary to prove Tesla's liability or seek a new trial on that claim or the Section 20 claim against the Director Defendants. 1-SER-3-4. For this additional reason, the Court cannot grant a new trial as to Tesla or the Director Defendants. *Unitherm*, 546 U.S. at 404 (holding that appellate court cannot order new trial for lack of sufficient evidence absent a Rule 50(b) motion in the district court).

## II. PLAINTIFF HAS NOT SHOWN ANY INSTRUCTIONAL ERROR

If the Court addresses the merits of Plaintiff's challenge to the scienter instruction, the Court should reject Plaintiff's argument that the district court erred in instructing the jury on this element, which was not disputed at trial. Plaintiff himself proposed an instruction noting that knowledge could satisfy the scienter requirement, admits the jury would have had to decide whether any Defendant acted knowingly to apportion damages, and proposed instructions mirroring the

---

[2] *See* 2-SER-325; 2-SER-365; 2-SER-372-73; 2-SER-428; 2-SER-433-34; 2-SER-436; 2-SER-438

language he now challenges. Plaintiff identifies no error in the instructions and certain cannot show any prejudice from the scienter instruction, which heavily favored Plaintiff.

### A. Plaintiff Failed To Preserve His Claim Of Instructional Error

At the threshold, Plaintiff failed to preserve the instructional error he now asserts warrants a new trial.

To preserve an objection to a jury instruction, a party must make the objection "on the record, stating distinctly the matter objected to and the grounds for the objection" either when the district court provides the party with a formal opportunity to make the objection or "promptly after learning that the instruction or request will be, or has been, given." Fed. R. Civ. P. 51; *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1072 (9th Cir. 2020). "Waiver of a jury instruction occurs when a party considers the controlling law, or omitted element, and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction." *Crowley v. Epicept Corp.*, 883 F.3d 739, 748 (9th Cir. 2018) (internal quotation omitted).

Plaintiff objects to three jury instructions: (1) Final Jury Instruction No. 6, which outlined the elements of the Rule 10b-5 claim; (2) Final Jury Instruction No. 9, the scienter instruction; and (3) a cautionary instruction on state-of-mind evidence that the district court read on the third day of trial. OB at 30-31.

35

As to the cautionary instruction, while Plaintiff argues (at 31) that the cautionary instruction misstated the law, Plaintiff expressly informed the Court that he did ***not*** object to the instruction. Instead, before the court read the instruction on the third day of trial, Plaintiff represented to the court that "[w]e obviously don't object to this particular supplemental instruction. And we are grateful for Your Honor crafting it." 2-SER-204-05; 2-SER-208. Plaintiff has waived his right to challenge it here. *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1053 (9th Cir. 2004) ("Because [moving party] did not raise the now-asserted objections to the district court with adequate specificity, [moving party's] assignments of error are waived.").

As to the district court's inclusion of "knowing" misconduct as a means by which to prove scienter, Plaintiff failed to object to the district court including the requirement in its instructions and in fact ***proposed*** that it do so. 1-SER-83. Plaintiff initially proposed that the district court tell the jury "You must still decide whether he acted knowingly"—substantially similar language to that which Plaintiff now challenges on appeal. 1-SER-64; 1-SER-65. Although Plaintiff later objected to the language in Instruction Nos. 6 and 9 that he challenges on appeal, Plaintiff cannot propose an instruction and then argue its erroneous when it is given. *See Sanghvi v. City of Claremont*, 328 F.3d 532, 541 (9th Cir. 2003) (holding party waived challenge to instruction by requesting an instruction that

incorporated the standard party alleged was erroneous); *Smith v. City of Oakland*, 379 F. App'x 647, 649 (9th Cir. 2010) (judicial estoppel barred a party from objecting to a standard incorporated in party's own proposed jury instruction).

### B.    The District Court Properly Instructed The Jury On The Element Of Scienter

At the close of trial, the district court instructed the jury that the element of scienter may be "established by showing *either*: the defendant knew his untrue statement was false, *or* the defendant had reckless disregard for whether the statement is true."  1-ER-48 (emphasis added); 1-ER-44.  The district court also informed the jury that Plaintiff satisfied this element, by instructing that  "[y]ou are to assume that Elon Musk made the statements" at issue in the case "with at least reckless disregard for whether the statements were true."  1-ER-44-45; 1-ER-48.  The final line of the instruction stated "[b]ut you must still decide whether Mr. Musk acted knowingly."  1-ER-48.

Plaintiff's main argument on appeal is that he is entitled to a new trial because this last sentence misstated the law.  Plaintiff is wrong.

A party alleging instructional error must show that the challenged instructions, when read as a whole, were not supported by the evidence, did not fairly and adequately cover the issues presented, incorrectly stated the law, or were misleading.  *Peralta*, 744 F.3d at 1082.  Any review for instructional error is guided by "the basic principle that" this Court "read[s] jury instructions as a whole

to determine whether they are accurate." *Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Illinois*, 421 F.3d 835, 858 (9th Cir. 2005), *amended*, 433 F.3d 1089 (9th Cir. 2006) (affirming instructions which as a whole accurately stated the law).

Plaintiff has identified no error in the scienter instruction.

*First*, the district court's instructions on scienter correctly stated the law. They plainly state that scienter can be established in two ways: (1) knowingly or (2) with reckless disregard. 1-ER-44, 1-ER-48. That is the governing standard in this Circuit. *Gebhardt v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010) ("Scienter may be established, therefore, by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements."); *Ponce v. SEC*, 345 F.3d 722, 729–30 (9th Cir. 2003) (person violates Rule 10b-5 by making materially false statements "that they know, or are reckless in not knowing, are false").

Unlike the instructions in *Gantt v. City of Los Angeles*, 717 F.3d 702 (9th Cir. 2013), the primary authority upon which Plaintiff relies (at 34), the instructions here correctly presented the "knowing" and "reckless disregard" standards in a "clear disjunctive format, so that a reasonable juror would understand each of these satisfies the broader" scienter standard. *Cf. Gantt*, 717 F.3d at 708 (holding district court erred because "it failed to state the intent-to-injure and deliberate-indifference standards in a clear disjunctive format").

38

*Second*, Plaintiff's attempt to manufacture error by narrowly focusing on a single sentence fails under the applicable standard. Courts reviewing for instructional error are "counsel[ed] against looking at any one jury instruction in isolation." *Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir. 2001). Instead, courts must "look[] to the instructions as a whole" to determine "if the substance of the applicable law was not fairly and correctly covered." *Id.* (cleaned up); *Norvell v. BNSF Ry. Co.*, 2023 WL 3299988, at *1 (9th Cir. May 8, 2023) (rejecting challenge to portion of an instruction when the instruction "read as a whole, neither created an improper defense nor shifted the burden of proof").

*Swinton* is instructive. There, this Court held that a general corporate liability instruction given in an employment harassment case, "taken in isolation," did not fully state the applicable law of employer liability for harassment. 270 F.3d at 807. But the Court declined to find error because the district court also gave more specific instructions that "[t]aken as a whole" did "fairly and correctly cover" the law. *Id.* As in *Swinton*, even if the sentence "[b]ut you must still decide whether Mr. Musk acted knowingly," 1-ER-48, "taken in isolation," 270 F.3d at 807, did not fully state the applicable law, Plaintiff cannot show any error because "[t]aken as a whole" the instructions did "fairly and correctly cover" the law. *Id.* In fact, the jury *was* required to decide whether Musk acted knowingly for apportionment. 1-ER-57.

39

*Third*, the instructions are not misleading simply because they instruct the jury on knowledge.  As the district court noted, Plaintiff's objection that the instruction is confusing or misleading "is nonsensical."  1-ER-22.  The instruction informs the jury that it is to assume that Musk made the statements "with at least reckless disregard" and instructs it that scienter is satisfied by "showing reckless disregard."  The instruction does not mislead the jury, it communicates that the element has been met.  1-ER-48.

At trial, Plaintiff agreed and eliminated any potential confusion or error by explaining exactly what the instructions meant to convey.  *See Allen v. Hylands, Inc.*, 773 F. App'x 870, 872-73 (9th Cir. 2019) (finding no prejudicial error where counsel clarified any potential confusion in closing).  In closing, Plaintiff's counsel told the jury that "the Court has instructed you to accept that Elon Musk acted with reckless disregard to the truth of both these tweets, which is sufficient to meet the state of mind for this element. You are to assume this element is met." 4-ER-626-27; *see also* 4-ER-607-08.  He also stated:

> "The Court has also instructed you -- so, that was made at least with reckless disregard to whether the statement was true or not. . . That is what is to be assumed. And that is enough to establish liability under Rule 10b-5. If defendant has reckless disregard for whether a statement is untrue, as you are to assume from Mr. Musk here, then the scienter or state of mind requirement is satisfied. ***The plaintiff does not have to show knowledge.*** And you don't need to find knowing conduct by Elon Musk to find him liable under Rule 10b-5. ***That is very clear here in***

> ***the Instruction No. 9,*** that shows it can be established
> either by knowledge or by reckless disregard." 4-ER-609
> (emphasis added).

Just as Plaintiff conveyed during summation, the instructions clearly and accurately state the law.  Plaintiff cannot show any error in this instruction now.

## C.    Even If Plaintiff Could Show Error, Any Such Error Was Harmless

Even assuming *arguendo* that the district court erred in instructing the jury on scienter, any such error would be harmless.

"An erroneous instruction does not require reversal . . . when the error is more probably than not harmless.  That standard is less stringent than review for harmless error in a criminal case and more stringent than review for sufficiency of the evidence."  *Hardeman v. Monsanto Co.*, 997 F.3d 941, 969 (9th Cir. 2021) (cleaned up).  "Where it is more probable than not that the jury would have reached the same verdict had it been properly instructed, the erroneous instruction is harmless."  *Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 798 (9th Cir. 2017) (cleaned up).

*First*, while Plaintiff argues (at 33-34) that any instructional error on scienter "is so fundamental" that it cannot be harmless, Plaintiff ignores that Defendants did not dispute the element of scienter at trial because the Court had ruled on this issue at summary judgment.  Although Plaintiff claims (at 33-34) that Defendants' counsel argued the issue of Musk's lack of knowledge was "exculpatory" in

closing arguments, Defendants made no argument that Plaintiff failed to carry his burden on scienter. 4-ER-711-14. Defendants' closing did not mention the element at all. Defendants' counsel identified and argued every instruction on Plaintiff's Rule 10b-5 claims *except* for scienter. 4-ER-711-14. Defendants' summation shows that scienter was not in dispute and that any error in that instruction was more probably than not harmless. *See Madrigal v. Allstate Ins. Co.*, 215 F. Supp. 3d 870, 912 (C.D. Cal. 2016), *aff'd sub nom. Madrigal v. Allstate Indem. Co.*, 697 F. App'x 905 (9th Cir. 2017) ("The court will look to the proceedings as a whole, including . . . the arguments of counsel, to determine if it is more probable than not that the jury would have reached the same verdict had it been properly instructed.").

*Second*, because there was "no reasonable likelihood of confusion," any error was more probably than not harmless. *Spencer v. Peters*, 857 F.3d 789, 803 (9th Cir. 2017). Any risk that a reasonable juror could have erroneously concluded that Plaintiff had to prove knowledge to satisfy the scienter element was cured by the district court's instruction that Plaintiff had established the element, which the jury is presumed to have followed. *Id.* It was also eliminated by Plaintiff's counsel's repeated—and uncontradicted—argument at trial that the instructions made "very clear" that Plaintiff had no burden to prove knowledge and that the

jury was required "to assume [the] element is met" under the court's instruction. 4-ER-626-27; 4-ER-609; *Allen*, 773 F. App'x at 872–73.

This case bears no resemblance to *Gantt*, 717 F.3d at 708, or *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 834–35 (9th Cir. 2019)—the two cases Plaintiff contends (at 34) mandate reversal. The instructions at issue in both cases concerned elements disputed at trial, *Gantt*, 717 F.3d at 708; *Erickson Prods.*, 921 F.3d at 827-28, not one the jury was instructed to assume was proven, 1-ER-48. Nor did counsel in either *Gantt* or *Erickson Prods.*, as here, clarify and eliminate any potential confusion or prejudice arising from the instructions at issue.

*Third*, any instructional error was harmless because the jury had ample evidence from which it could conclude that Plaintiff failed to meet his burden on the other elements of his Rule 10b-5 claims. *Benigni v. City of Hemet*, 879 F.2d 473, 480 (9th Cir. 1988) (holding instructional error harmless where sufficient evidence supports jury's verdict for prevailing party); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1065 (9th Cir. 2008) (holding instructional error harmless because there was "little . . . evidence establishing a necessary element" of plaintiff's claim so it was "more probable than not that the jury would have reached the same result" even if properly instructed).

For instance, Plaintiff does not even contend that the jury could reach no other conclusion than that he failed proved loss causation, "*i.e.*, a causal

connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *supra*, at 30-34. On this element, Plaintiff had the burden to prove that "the misrepresentations played a substantial part in causing the injury or loss that Plaintiff suffered." 1-ER-52; *Dura*, 544 U.S. at 345 (securities laws were not designed "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."). Thus, Plaintiff bore the burden to "reasonably distinguish any security-price reaction to the misrepresentations at issue from the market's reaction to other factors, such as other information or events that could affect the prices of Tesla's securities." 1-ER-52; *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015) ("[I]n order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors.").

But Plaintiff did not attempt to offer the statistical evidence necessary to prove the alleged misstatements caused Tesla's stock price to increase or that the purported revelation of their falsity caused Tesla's stock price to decrease. Plaintiff, as his own experts admitted, never isolated the price impact of the alleged misrepresentations from the price impact of the true statement that Musk was

considering taking Tesla private at $420 per share (or any of the other nonactionable statements he made that day). 2-SER-384-87. Plaintiff also did not separate and identify the market change caused by the single line in the August 16 *New York Times* article that "funding was far from secure," the alleged corrective disclosure, from the impact on Tesla's share price caused by the extensive reporting in that same article about Musk's health. 2-SER-416.

Nor did Plaintiff—as was required, 1-ER-52; *Glickenhaus*, 787 F.3d at 421—isolate the price impact of the alleged fraud during the Class Period from other market and industry factors. Instead of disaggregating the effects of these other factors on Tesla's share price for each day of the Class Period, Plaintiff's expert simply assumed that, but-for the alleged misrepresentations, Tesla's stock would have remained static at $312.90 from August 7 to August 16. 6-ER-1283. Plaintiff's expert Hartzmark admitted on the stand that he would need to "adjust[]" his calculations to fix this error. 2-SER-399-404.

Substantial evidence also established that any alleged loss was simply the result of "non-statistically significant" stock movements*, i.e.*, price changes that cannot be distinguished from what "would be expected by chance." 2-SER-390; 3-ER-499. For example, Hartzmark admitted that the entire decline between August 7 and August 13—when Musk disclosed additional detail regarding the meaning of his August 7 tweets—was statistically insignificant. 2-SER-390. Thus, if the jury

determined that the August 13 Blog Post was a corrective disclosure—a conclusion supported by substantial evidence, *see supra*, at 16-19—it could find that Plaintiff presented no evidence that the alleged fraud caused any loss. 2-SER-413-14.

This Court also has more than sufficient evidence to conclude the verdict rested (and could have rested) on Plaintiff's failure to prove materiality. As the district court correctly held in denying Plaintiff's Rule 50(b) motion, the jury could have very reasonably concluded—based on Musk's meeting with the PIF, personal financial resources, communications with other investors, and the stock price reaction to his disclosures in the August 13 Blog Post—that Musk's statements were not materially misleading. 1-ER-15-16; *see infra*, at 54-55.

Moreover, Plaintiff had the burden to establish reliance, which he elected to do through the fraud-on-the-market presumption. 1-ER-50.[3] But the jury also had ample evidence from which it could conclude that Defendants rebutted the fraud-on-the-market presumption "by proving by a preponderance of the evidence that the ***misrepresentation*** did not affect the market price of Tesla's stock." 1-ER-51 (emphasis added); *Halliburton*, 573 U.S. at 278-29. For instance, Plaintiff's expert testified that there would have been the "same exact" market reaction had Musk

---

[3] The fraud-on-the-market presumption requires proof "'(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

simply tweeted that he was considering taking Tesla private. 3-ER-486-87. And, as the district court noted at the summary judgment stage, the market's reaction to the August 13 Blog Post provided evidence from which the jury could find that the misrepresentations did not affect the market price of Tesla's securities. 1-ER-15, 1-ER-97; *see supra*, at 16-19.

*Finally*, if anything, the jury instructions wrongly prejudiced Defendants—not Plaintiff. The district court instructed the jury based on its summary judgment findings that Musk's statements were false and that Musk acted with reckless disregard in making them. But the district court erred in granting summary judgment on the elements of falsity and scienter without finding that the statements were materially misleading. 1-ER-95-98. As to falsity, the law is clear that it can be satisfied only by "a ***material*** misrepresentation (or omission)." *Dura*, 544 U.S. at 341 (emphasis added); 17 C.F.R. § 240.10b–5(b) ("It shall be unlawful . . .[t]o make any untrue statement of a material fact or to omit to state a material fact"). Likewise, scienter requires "a reckless omission of ***material facts***." *In re Alphabet, Inc. Sec. Litig*., 1 F.4th 687, 701 (9th Cir. 2021) (emphasis added). And, as this Court has recognized, these questions are "fact-specific issues which should ordinarily be left to the [jury]." *In re Apple Computer Sec. Litig*., 886 F.2d 1109, 1113 (9th Cir. 1989). Here, however, the district court instructed the jury as to the satisfaction of falsity and scienter based on its erroneous summary judgment,

47

tipping the scales in Plaintiff's favor. That the jury still ruled in favor of Defendants only underscores the harmlessness of the instructional error Plaintiff now raises.

## III. PLAINTIFF CANNOT OBTAIN JUDGMENT IN HIS FAVOR AS TO THE ELEMENT OF MATERIALITY

Even were the Court to consider Plaintiff's request for judgment in his favor as to materiality, Plaintiff's request is procedurally flawed and lacks merit.

### A. Plaintiff's Request For Judgment In His Favor As To Materiality Is Procedurally Flawed

At the outset, Plaintiff's request that this Court enter judgment as a matter of law on a single element of his Rule 10b-5 claims should be summarily denied as procedurally improper.

As explained *supra*, at 30-34, this Court need not and should not consider Plaintiff's piecemeal demand for judgment as a matter of law on certain elements because the jury's general verdict was supported by alternate theories, including one—loss causation—that Plaintiff has never challenged. *McCord*, 873 F.2d at 1273-74; *Northpoint*, 413 F.3d at 1311 (affirming denial of plaintiff's motion for judgment as a matter of law and new trial). Indeed, the record shows, and Plaintiff does not dispute, that the jury had ample evidence to find no liability based on Plaintiff's failure to prove loss causation alone. *See supra*, at 43-45. Under these circumstances, the Court "must uphold the general verdict" and deny Plaintiff's

efforts to obtain a new trial without any further analysis. *McCord*, 873 F.2d at 1273-74.

Furthermore, Plaintiff's request that the Court enter judgment as a matter of law on a single element is irrelevant and moot because it is contingent on this Court ordering a new trial. As explained, *supra*, at 31-34, this Court cannot grant Plaintiff a new trial because—at a minimum—he did not challenge the legal or factual basis for the verdict on loss causation. *McCord*, 873 F.2d at 1273-74. And Plaintiff's demand for a new trial on instructional error fails on the merits. *See supra*, at 38-49.

But, even were this Court to grant a new trial based on instructional error, any new trial would be based on an entirely new record. Plaintiff cannot have it both ways by insisting on a general verdict, 1-SER-87-89, and seeking a new trial based on the idea that a purported instructional error on one element infected the entire proceeding and then arguing that the Court should enter judgment on a specific element in a new trial based on the record developed in the very trial he contends was defective. Plaintiff cannot be allowed to "play procedural brinkmanship with the jury system and take advantage of uncertainties [he] could well have avoided." *McCord*, 873 F.2d at 1274.

## B.    In Any Event, A Reasonable Juror Could Find Plaintiff Failed To Prove The Alleged Misstatements Were Materially Misleading

If the Court considers the merits of this argument, it should reject it.

Materiality turns on whether the difference between an alleged misrepresentation and the actual state of affairs would have been significant to a reasonable investor in her decision to buy or sell a security. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (noting that, under *TSC Indus.* materiality turns on "the significance of the difference" between the true state of affairs and misrepresentation); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000) (there "must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (brackets in original).

Litigants seeking to overturn a jury's verdict on materiality in a securities case face a particularly high bar because determining materiality requires "delicate assessments" that are "peculiarly . . . for the triers of fact." *TSC Indus.*, 426 U.S. at 450. A court can only find that a jury lacked a legally sufficient basis for its verdict if the evidence shows that the difference between an alleged misrepresentation and the true state of affairs is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Id.*

Because a "factual representation can be untrue but not material," Plaintiff had the burden at trial to prove both that (1) there is a "substantial likelihood that a

reasonable investor would consider the [misrepresented] fact important in deciding whether to buy or sell that security" and (2) the "misrepresentation gives a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." 1-ER-47.

### 1. "Funding Secured" Was Not Materially Misleading

The district court correctly found that substantial evidence supported the jury's conclusion that Musk's statement "[f]unding secured" was not materially misleading. 1-ER-12-15.

The trial evidence showed that the PIF—days before Musk's tweets—had made a "serious verbal commitment" to take Tesla private and provide the necessary funding to do so. 2-SER-306-310. Three attendees of that meeting—Musk, Ahuja, and Teller—all testified that, although the parties did not discuss any specific price or structure at the meeting, the PIF communicated that it was willing do whatever was necessary to fund the transaction, that it understood the scale of the financial commitment, and that it had enough funding to complete the transaction on its own. 2-SER-223; 2-SER-240-41; 2-SER-306-310; 3-ER-578-82. As these witnesses testified, the PIF's managing director communicated to Musk that the PIF was "ready to act" once Musk made a decision, 2-SER-291, and they

had the impression that the PIF and Musk had a "handshake deal" to take Tesla private, 3-ER-581-82.[4]

Minutes from two separate special meetings of Tesla's Board held before Musk posted his tweets confirmed as much. 3-SER-449-53. And Musk contemplated and was prepared to use his own vast personal financial resources, including his billions of dollars in SpaceX stock, to fund the transaction as necessary. 2-SER-219-20; 2-SER-269.

The evidence also showed that, when Musk published details of his meeting with the PIF in the August 13 Blog Post—thus revealing the true state of affairs to the market—Tesla's stock price rose. 4-ER-775; 2-SER-395. While Plaintiff attacks (at 48-50) the district court's reliance on the August 13 Blog Post, ample evidence supports the inference that an increase in Tesla's stock price following the disclosure of the true state of affairs means that the alleged misstatements were not materially misleading.[5] On summary judgment and in its denial of Plaintiff's

---

[4] The jury did not have to accept Plaintiff's argument that the statements were materially false because Musk did not have a "firm, unconditional commitment of funding," 2-SER-191; 2-SER-211; 2-SER-358, but rather had to analyze the materiality of the statement that Musk made: "[f]unding secured."

[5] Plaintiff points (at 53-54, 56) to numerous facts—that the take-private was preliminary, that no structure had been determined as of August 7, that Musk had not discussed price, structure, percentage of ownership and regulatory approval with the PIF on July 31, and that Musk was seeking to raise money from other investors—that he asserts rendered the statements materially false. But Musk disclosed these very facts in his tweets and blog posts. 4-ER-735-37; 3-SER-445-

Rule 50(b) motion, the district court held that this stock price reaction allowed a juror to reach the conclusion that the initial market reaction to the tweets "was a response to Mr. Musk contemplating taking Tesla private not to" the "statements that, *e.g.*, funding was secured or investor support confirmed." 1-ER-97, 1-ER-16; *see Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 464 (2013) (noting it is "uncontroversial" that "immaterial misrepresentations and omissions by definition do not affect stock price in an efficient market.") (cleaned up); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (Alito, J.) ("[I]f a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed … was immaterial as a matter of law.'").

Nor is Plaintiff correct to assert (at 50) the August 13 Blog Post was not a "fully corrective disclosure" sufficient to support the jury's conclusion. "[T]o be corrective, a disclosure 'need not precisely mirror the earlier misrepresentation.' It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). Plaintiff's experts admitted that the August 13 Blog Post revealed facts showing that Musk's statement was inaccurate such that it could constitute a corrective disclosure. 2-SER-394-95; 2-SER-215.

---

47; 4-ER-776. In response to these disclosures, Tesla's share price went up. 2-SER-395.

Indeed, Plaintiff's own expert provided testimony from which the jury could conclude the statements were not materially false, testifying that the options market would have the "same exact movement" had Musk only announced that he was considering the take-private.  3-ER-486-87.[6]

Plaintiff erroneously argues (at 37-46) that a reasonable juror could conclude only that Plaintiff had proved the materiality of the alleged misstatements in Musk's tweet because a reasonable shareholder would consider the tweets "important."  That is not the correct inquiry.  Instead, the jury had to determine whether the difference between the misrepresented fact and the true state of affairs would be significant to an investor's decision to buy or sell securities.  *TSC Indus.*, 426 U.S. at 449, 459-60 (holding that, while the price of a warrant may have been important to investors, question of whether difference between warrants worth $5.25 each and warrants worth $3.50 each would be material to an investor was a question of fact for the jury).

And, by asserting throughout his argument that Musk's "tweet"—as opposed to the specific statement "[f]unding secured"—was material, Plaintiff directs this

---

[6]   In addition, while Plaintiff argues otherwise (at 50), because Plaintiff did not isolate the impact of Musk's true statement from the alleged misrepresentations in his analysis of Tesla's options, the jury could reasonably conclude that any post-August 13 volatility was a residual reaction to Musk's announcement of the take-private.  3-ER-486-87; 2-SER-384-87.  And the decision of an analyst to decline to revise his price target after August 13 (cited at 50) is not evidence compelling a different result.

54

Court to consider the wrong question. *See, e.g.*, OB at 39, 43 ("Unrebutted expert testimony that the ***tweet*** was material." (emphasis added)). Plaintiff had to prove that Musk's "misrepresentation" was materially false, 1-ER-47, and it was undisputed that the first half of the tweet was true, *e.g.*, 4-ER-782, 2-SER-383. As a result, much of the evidence Plaintiff cites—including Ahuja's testimony that the "going-private comment is . . . material information" (3-ER-404-405, cited at OB at 39)—refers to the true portion of the tweet and does not address the relevant inquiry.

Finally, Plaintiff is wrong to contend (at 51-53) that, because the district court previously found on summary judgment that the statement "[f]unding secured" was factually misleading, it erred in concluding that there was substantial evidence for the jury to conclude that it was not "materially false." As the district court made clear in its post-trial order (and as Plaintiff previously argued, 1-SER-144-45), the conclusion that the statement was "factually false" did not preclude a finding that the state of affairs did not "differ . . . in a way that would be significant to a reasonable investor." 1-ER-15. The district court correctly applied the law on materiality, which turns not on whether a statement is factually false but whether the difference between the misrepresentation and the truth is "significant" to a reasonable investor. *TSC Indus.*, 426 U.S. at 449, 459-60.

In light of this evidence, Plaintiff cannot carry his burden to show that there was no legally sufficient basis for the jury to conclude the statement was materially false. *See Winarto*, 274 F.3d at 1283.

### 2. "Investor Support Confirmed" Was Not Materially False

Substantial evidence also supported the jury's verdict that Plaintiff failed to meet his burden to prove that the second tweet, "Investor support confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote," was materially false.

As the district court recognized in its summary judgment order, Musk's tweet made a distinction between "investor" and "shareholder." "Investor" referred to the person or entity interested in participating in a take-private transaction while "shareholder" referred to already existing investors in Tesla. 1-ER-91. A reasonable juror could come to the same conclusion. Indeed, lead plaintiff Littleton testified that "[i]nvestor support is confirmed" was "just another affirmation that funding was secured." 2-SER-178. Thus, Plaintiff errs in arguing now (at 62) that Musk's decision to halt the take-private because existing **shareholders** preferred that Tesla remain public shows he lacked "investor support."

Substantial evidence demonstrated that the PIF—an investor interested in investing billions to take Tesla private—supported Musk's transaction. *See supra*,

at 9-12; 51-52. At that point, the PIF made a "serious verbal commitment" to fund a take-private and "was ready to act" once Musk made a decision on its structure. 2-SER-306-07. The PIF indicated that it supported and wished to be a part of a private Tesla. 2-SER-222-23; 2-SER-240-42; 2-SER-306-10; 3-ER-578-82. And another major Tesla investor, Ron Baron, emailed Musk prior to the publication of the tweet communicating the same. 5-ER-1075. Moreover, Musk knew at the time that Larry Ellison, the billionaire founder of Oracle, was historically supportive and interested in investing in a private Tesla. 2-SER-224. Plaintiff's argument (at 64) that "investor support is confirmed" was materially false because Baron and the PIF only owned 6% of Tesla does not somehow undermine the evidence that investors supported a take-private transaction.

Further, as discussed *supra*, at 54-55, the stock price reaction to the August 13 Blog Post provides substantial evidence that the statement "investor support is confirmed" was not materially misleading. 1-ER-16. Multiple witnesses testified that "investor support is confirmed" merely helped "confirm" or "reinforce" funding secured. 2-SER-169; 6-ER-1167.

As Littleton testified, "investor support . . . didn't change anything" with regards to the trades he made on August 7 and just "helped confirm" what he already knew. 2-SER-169. Plaintiff's admission that he did not consider the statement "[i]nvestor support is confirmed" "important in deciding whether to buy

or sell" his Tesla securities—and lack of empirical evidence showing the market impact of that specific statement—provides a "legally sufficient basis for a reasonable jury to find for" Defendants on this issue. *See Winarto*, 274 F.3d at 1283; 2-SER-169; 1-ER-47.[7]

## **CONCLUSION**

The Court should affirm the judgment of the district court.

Dated:  January 26, 2024        Respectfully submitted,

s/ Ellyde R. Thompson
Alex Spiro
Ellyde R. Thompson
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7100

Michael Lifrak
Alex Bergjans
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Counsel for Defendants-Appellees*

---

[7]  On appeal, Plaintiff does not even attempt to argue that the specific statement "Only reason why this is not certain is that it's contingent on a shareholder vote" is materially false.  OB at 46-51, 61-64.  It was not.  Musk disclosed with that tweet the preliminary nature of the take-private transaction under consideration, and Tesla's stock price increased when he disclosed a number of steps yet to be completed before a shareholder vote.  *See supra*, at 12-13, 16-17.

## **REQUEST FOR ORAL ARGUMENT**

Appellees respectfully request that this Court hear oral argument in this appeal.

## <u>STATEMENT OF RELATED CASES</u>

Defendants-Appellees are not aware of any related cases pending in this Court.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16010

I am the attorney or self-represented party.

**This brief contains** 13,684 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Ellyde R. Thompson **Date** January 26, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** 61 *Rev. 12/01/22*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Opening Brief Of Defendants-Appellants and the accompanying Excerpts of Record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 26, 2024          s/ Ellyde Thompson
                                 Ellyde R. Thompson